**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
No. 99-10497

PATRICIA M. ADAMS, et al.

Plaintiffs-Appellants

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal From The United States District Court
for the Northern District of Texas
_____
July 5, 2000

Before JONES, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

This estate tax case presents a single issue: Whether discounts for lack of control, lack of marketability, and poor portfolio diversity are applicable when appraising the value of an assignee's fractional interest in a Texas general partnership for estate tax purposes. The district court correctly identified the relevant interest of the partnership in question — that of a partner's assignee, not that of a full-fledged partner — but reached the erroneous legal conclusion that the assignee of a 25 percent partner's interest has a "well-established" right to receive a 25 percent pro rata share of the partnership's net asset value ("NAV") without being reduced by such discounts. Proceeding on the basis of this erroneous conclusion of law, the district

court held that the assignee's interest would change hands between a willing buyer and a willing seller for a price equal to such an undiscounted 25 percent ratable share of the partnership's NAV.[1]

Our "Erie Guess" would likely be that — under the Texas partnership law, which is applicable to this case — an assignee's interest in a partnership would be subject to such discounts; but, more significant to today's inquiry, we are firmly convinced that it is anything but "well-established" that a partner's assignee has the right to receive a 25 percent share of NAV. We discern a very real possibility that, as a matter of law, the holder of an assignee interest in the partnership could be stuck with an unmarketable interest in a partnership that owns a poorly diversified mix of assets and over which the assignee has no legal control. If this proved to be the case, the fair market value of the 25 percent assignee interest would be substantially less than a straight, ratable 25 percent share of the partnership's NAV, thereby reflecting these undesirable characteristics. More to the point, the legal uncertainty that obscures the extent, if any, to which an assignee has the right to provoke liquidation or, alternatively, to force a straight pro rata redemption of his interest, suggests that any effort to exercise such putative rights would be met with strong resistance from the remaining partners.

---

[1]The court recognized, and the government does not contest, the propriety of a discount for <u>liquidation-related</u> brokerage costs.

This legal uncertainty — which raises the specter of costly litigation in addition to an adverse result — is itself a factor that must be taken into account when appraising the fair market value of an assignee's interest for estate tax purposes. We therefore reverse the district court's judgment in favor of the government and remand the case for further proceedings.

## I.

## FACTS AND PROCEEDINGS

The material facts are undisputed and have for the most part been stipulated by the parties. Mildred M. Mendenhall ("Decedent") died owning a 25 percent interest in Taylor Properties, a Texas general partnership (the "partnership"). The other 75 percent of the partnership was owned equally by three of Decedent's siblings, 25 percent each. The four siblings had formed the partnership to hold and manage several items of family property inherited from their father, including ranch land, marketable securities, and mineral royalties and working interests.

At all times relevant to this appeal the partnership was governed by the Texas Uniform Partnership Act ("TUPA"),[2] that state's version of the Uniform Partnership Act (1914) ("UPA").[3]

---

[2]Tex. Civ. Stat. art. 6132b §§1-46. Texas has adopted the Revised Uniform Partnership Act (1996). See Tex. Civ. Stat. art. 6132b-1.01 et seq. The parties agree that this case is governed by the UPA. See infra n.29.

[3]6 Uniform Laws Annotated 125 (1995 Master Edition).

The partnership agreement designated Decedent's brother as the managing partner; he alone was given responsibility for managing the day-to-day affairs of the partnership and for executing documents on the partnership's behalf.

Under the TUPA, the death of a partner causes a partnership to dissolve, absent a contrary provision in the partnership agreement.[4] No such contrary provision is contained in the instant partnership agreement.

Decedent died in 1992. The executors of the Decedent's estate filed a Federal Estate Tax Return (Form 706) in which the 25 percent partnership interest that passed from Decedent to her heirs was returned at $7.481 million.[5] The IRS audited the return and assessed a deficiency based in part on the IRS's conclusion that the Decedent's 25 percent interest in the partnership should have been valued at $7.604 million. The Estate paid the assessment and, pursuant to I.R.C. §6511, filed suit for a refund in federal district court.

The government filed a motion for partial summary judgment seeking a determination that the proper interest to value for federal estate tax purposes is an assignee interest in a

---

[4]See TUPA §31(4) ("[Dissolution is caused by] the death of any partner unless the agreement between the partners provides otherwise").

[5]As shall be seen in subsequent portions of this opinion, the Estate's original return value of the interest was substantially greater than the value asserted in its suit for refund.

liquidating partnership. The Estate did not dispute that the relevant interest for federal estate tax purposes was an assignee interest,[6] but maintained that because "dissolution" of the partnership would <u>not</u> necessarily result in a "winding up"[7] or liquidation of that partnership, the government is wrong in contending that liquidation of the partnership was inevitable. The district court agreed with the Estate, finding that "[a]s an alternative to liquidation, the remaining partners can continue the business of a dissolved partnership, provided they pay the deceased partner's estate the value of her [assignee] interest as of the date of the dissolution." The court concluded that the relevant interest for federal estate tax purposes is "most accurately described as an assignee interest in a dissolved, rather than liquidating, partnership."

The parties incorporated this conclusion into their joint

---

[6]<u>See</u> TUPA §28-B(B) ("On the death of a partner, such partner's surviving spouse (if any) and such partner's heirs, legatees or personal representative, shall to the extent of their respective interest in the partnership, be regarded for purposes of this Act as assignees and purchasers of such interest from such partner.").

[7]"Dissolution" and "winding up" are terms of art under the UPA. Section 29 provides: "Dissolution of a partnership is defined as the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."

As one court succinctly explained, "[d]issolution is the first of three stages in the ending of a partnership. The next two stages are winding up and termination. Winding up is the process of settling partnership affairs after dissolution. Termination is the point in time when all the partnership affairs are wound up." <u>Weisbrod v. Ely</u>, 767 P.2d 171, 174 (Wyo. 1989) (internal citations omitted).

5

stipulation of facts. They further stipulated that (1) the gross value of the partnership's assets at the time of Decedent's death was $33.328 million, and that the partnership had $.247 million in debt, resulting in an "NAV" equal to the difference, i.e., $33.081 million, 25 percent of which is $8.270 million; and (2) $8.270 million is the starting point for valuing the assignee interest that passed from the Decedent to her heirs. These stipulations leave as the sole point of contention between the parties the applicability of discounts for (1) lack of marketability, (2) lack of control, (3) uncertain rights, and (4) ownership of an undesirable mix of assets.

Following a bench trial, the district court entered a memorandum opinion under Fed. R. Civ. P. 52(a) in favor of the government. The court held the discounts relied on by the Estate irrelevant and accepted the government expert's appraisal of $7.821 million, derived by (1) discounting NAV by 5.4 percent for brokerage costs that would be incurred in a liquidation and (2) multiplying that discounted NAV by .25 to determine the appropriate pro rata share. Consequently, the court denied the Estate's refund claim, and the Estate timely appealed.

## II.

## ANALYSIS

A. <u>Jurisdiction</u>

We have jurisdiction to hear appeals from final judgments of

6

the district courts pursuant to 28 U.S.C. § 1291.

B.    Standard of Review

As a general rule, valuation of property for federal tax purposes is a question of fact that we review for clear error.[8] This case is unusual, however, because there is a pure question of law imbedded in the valuation calculus:  To arrive at a reasonable conclusion regarding the value of the property at issue in this case, one must first determine the rights afforded to the owner of such property by the applicable state law.  More specifically, to appraise the value of a fractional assignee interest in a dissolved Texas general partnership, one must consider whether, under Texas partnership law, the holder of such an assignee interest has the right to force liquidation of the partnership or, alternatively, the right to force the remaining partners to buy out his interest, and, if so, for what value, i.e., for a pro rata share of NAV undiscounted except for liquidation-related brokerage costs or for a fully discounted share.  So, despite the general rule that valuation is a question of fact reviewed for clear error, this case presents an exception.  Inasmuch as the trial court's ultimate finding here is predicated on a legal conclusion regarding the rights inherent in the property, its valuation is subject to <u>de</u>

---

[8]<u>See, e.g.</u>, <u>Estate of Bonner v. United States</u>, 84 F.3d 196 (5th Cir. 1996) (<u>per curiam</u>); <u>Propstra v. United States</u>, 680 F.2d 1248 (11th Cir. 1982).

novo review.[9]

C.    <u>Federal Estate Tax Valuation Standard</u>

The Federal Estate Tax is an excise tax imposed on the fair market value of property transferred at death, less allowable deductions.[10]  The property to be valued is "the property which is actually transferred, as contrasted with the interest held by the decedent before death or the interest held by the legatee after death."[11]  To determine the exact nature of the property or interest in property that is transferred federal courts must look to state law, in this case Texas partnership law.[12]

Fair market value is determined by application of the ubiquitous "willing buyer-willing seller" test, defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."[13]  When applying the willing buyer-willing seller test, "the

---

[9]<u>Cf.</u> <u>Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha</u>, 754 F.2d 591, 595 & n.4 (1985) ("The 'clearly erroneous' rule does not apply . . . to determinations reached by application of an incorrect legal standard.").  <u>See also</u> Steven A. Childress & Martha S. Davis, <u>Federal Standards of Review</u> § 2.16 (3d ed.).

[10]<u>See</u> <u>Estate of Bright v. United States</u>, 658 F.2d 999, 1001 (5th Cir. 1981) (<u>en banc</u>).

[11]<u>Id.</u> (citing <u>United States v. Land</u>, 303 F.2d 170 (5th Cir. 1962)).

[12]<u>Id.</u>

[13]<u>See</u> Treas. Reg. §20.2301-1(b); <u>United States v. Cartwright</u>, 411 U.S. 546, 551 (1973); <u>see also</u> Treas. Reg. §20.2301-3

potential transaction is to be analyzed from the viewpoint of a <u>hypothetical</u> buyer whose only goal is to maximize his advantage. Courts may not permit the positing of transactions which are unlikely and plainly contrary to the economic interest of a hypothetical <u>buyer</u>."[14]  In that same vein, the "'willing <u>seller</u>' is not the estate itself, but is a hypothetical seller."[15] Considerations that "depend[] on the identity of the seller as the legatee and the executor, cannot control the value of the asset."[16] In every case all relevant facts must be considered.[17]

D.   <u>District Court Opinion</u>

The district court's opinion is grounded in a legal premise with which we take issue, i.e., that under Texas partnership law, a partner's assignee has a "well-established statutory right" either (1) to force the partnership to liquidate and distribute to the assignee his pro rata share of the partnership's NAV, or (2) if the remaining partners chose to carry on the partnership business, to force the remaining partners to pay the assignee what he would

---

("Valuation of Interests in Businesses").

[14]<u>Estate of Smith v. Commissioner</u>, 198 F.3d 515, 529 (5th Cir. 1999)(emphasis added) (quoting <u>Eisenberg v. Commissioner</u>, 155 F.3d 50, 57 (2d Cir. 1998) (quoting <u>Estate of Curry v. United States</u>, 706 F.2d 1424, 1428 (7th Cir. 1983))); <u>see also</u> <u>Estate of Bright v. United States</u>, 658 F.2d 999 (5th Cir. 1981) (<u>en banc</u>).

[15]<u>Estate of Bonner v. United States</u>, 84 F.3d 196, 198 (5th Cir. 1996) (<u>per curiam</u>). (Emphasis added).

[16]<u>Id.</u>

[17]<u>Estate of Smith</u>, 198 F.3d at 529.

have received had there been a liquidation.  From the assignee's perspective these two options are economically indistinguishable, so we shall refer to them collectively as "liquidation rights."

It follows from the district court's conclusion that a partner's assignee has "well-established" statutory liquidation rights that entitle the assignee to convert his partnership interest into money, that the discounts incorporated into the Estate's valuation analysis could not be applied.  These discounts are premised on the existence of undesirable characteristics inherent in the ownership of a minority assignee interest in a partnership in which the assignee does not possess the power to compel liquidation.  If a hypothetical willing buyer of the assignee interest knew for a legal certainty that, as the district court held, he could exercise liquidation rights on a favorable basis immediately following purchase and thereby trade his newly-acquired assignee interest for cash, he could ignore the problems that attend the ownership of an assignee interest in an ongoing partnership and pay up to the amount that would be obtained in a liquidation, i.e., a full pro rata share of the partnership's NAV, discounted only for its share of the liquidation-related brokerage costs.  The district court held that such a legal certainty exists; we are less sanguine, falling somewhere between serious doubt and total disagreement.

E.   Appraisals

10

The parties' respective valuation analyses are grounded in the reports of their experts. The government's expert appraised the assignee interest at $7.821 million. As noted earlier, this figure was calculated by (1) reducing the partnership's total NAV of $33.081 by 5.4 percent to reflect the brokerage expenses that would be incurred if the partnership were liquidated, and (2) multiplying that sum by 25 percent to compute the assignee's pro rata share of NAV net of brokerage costs that would be incurred in liquidation.

The government's expert conceded that if, unlike a partner, an assignee does not have the absolute legal right to demand liquidation, discounts for lack of marketability and lack of control would be applicable. But as he expressly proceeded on the assumption that TUPA grants liquidation rights to the holder of an assignee interest in a dissolved Texas general partnership, he treated the discounts as inapplicable.

In contrast, the Estate's expert appraised the assignee interest at $3.871 million. He proceeded on the premise that there is no clearly-established right of liquidation in favor of the holder of an assignee interest under Texas partnership law. He therefore concluded that a fully informed hypothetical willing buyer of the assignee interest would take cognizance of the likelihood that he might be buying a share in a business (1) over which he has no control, (2) that owns an unattractive mix of assets, and (3) that is not readily marketable. Based on these assumptions, the Estate's expert began his analysis with the

11

partnership NAV and discounted it as follows:

| | |
|---|---:|
| partnership NAV | $33,081,400 |
| less: lack-of-control discount (20%) | (6,616,400) |
| | 26,465,000 |
| | 26,465,000 |
| less: portfolio-mix discount (10%) | (2,646,500) |
| | 23,818,500 |
| | 23,818,500 |
| less: lack-of-marketability discount (35%) | (8,336,475) |
| | 15,482,025 |
| | 15,482,025 |
| multiplied by: share of ownership | 25% |
| | 3,871,000[18] |

F.   Does an Assignee Have Absolute Liquidation Rights as a Matter
of Law?

The pivotal difference between the valuation methodologies
employed by the parties' experts is their disagreement on whether
the hypothetical willing buyer of the assignee interest would be
acquiring an interest that includes, as a legal certainty, the
right to demand liquidation.  We agree with the Estate's expert
that under Texas law there is either no clear answer to the
question whether an assignee has liquidation rights or that the
best Erie guess is that he does not.

The government cites to TUPA §§26, 27(2), 37, and 42 to
support its contention that an assignee has "absolute" liquidation
rights.  We conclude that there is only one section of TUPA that
bears on this question — §42.  As the district court considered

_____

[18]Figures are rounded.

other sections, however, and as the government urges that the district court was correct in so doing, we too shall address them.

The government places primary emphasis on the following two sections:

> **§ 26.  Nature of Partner's Interest in Partnership**
> A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property for all purposes.

> **§ 27.  Assignment of Partner's Interest**
> (1) * * *
> (2) In case of dissolution of the partnership, the assignee is entitled to receive his assignor's interest.

By their plain terms these sections provide that a partner's assignee is entitled to receive his assignor's interest, defined as "his share of the profits and surplus."  It does not necessarily follow, however, that an assignee has the right to extract that share from the partnership on demand.  To reach that conclusion, one would have to read the grant of liquidation rights into the above quoted TUPA provisions; at a minimum, that would be an unwarranted extension of the plain language of these sections.[19]

Furthermore, to accept the government's assertion that together §§26 and 27(2) grant liquidation rights to an assignee is

---

[19]A report by the UPA Revision Subcommittee of the Committee on Partnerships and Unincorporated Business Organizations found that "[t]he expression 'his assignor's interest' in subsection (2) is ambiguous."  The Subcommittee recommended that subsection (2) be revised to read that an assignee is "entitled to receive . . . the distribution which the assigning partner would be entitled to receive upon dissolution of the partnership . . . ."  Harry J. Haynsworth IV et al, Report: Should the Uniform Partnership Be Revised?, 43 Bus. Law. 121, 156 (Nov. 1987).

to render §37 surplusage.  Section 37 provides:

**§ 37.  Right to Wind Up**
Unless otherwise agreed the <u>partners</u> who have not wrongfully dissolved the partnership or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; provided, however, that any partner, his legal representative or his <u>assignee</u>, <u>upon cause shown</u>, may obtain winding up by the court. (Emphasis added).

As discussed above,[20] "winding up" is a term of art under the UPA that describes the process that occurs during the period following dissolution and preceding termination, during the course of which work in process is completed, partnership assets are sold, creditors are paid, and the business of the partnership is brought to an orderly close.[21]  The right to liquidate is thus a lesser included right within the right to wind up.

Section 37 sets up a dichotomy:  (1) All partners have an unfettered right to wind up, but (2) an assignee can do so only for cause.  If, in combination, §§26 and 27(2) grant an assignee liquidation rights, then the clause in §37 that limits the assignee's right to wind up to only those instances when cause can be shown would be wholly unnecessary if not internally inconsistent.

The parties have neither argued that "cause" was shown in this case nor cited authorities defining "cause" in this context.  A

---

[20]<u>See</u> <u>supra</u> n.6.

[21]<u>See</u> <u>Estate of McGahren v. Heck (In re Weiss)</u>, 111 F.3d 1160, 1166 (4th Cir. 1997).

14

leading treatise on partnership law explains that judicial winding up for cause is a last resort that is typically granted on a showing of an immanent possibility that the assets of the business will be dissipated if left in the partners' control.[22] There are no facts in this record suggesting that Decedent's siblings, as the remaining partners of the dissolved (but not terminated) partnership, were in any way dissipating partnership assets or likely to do so. It is therefore antithetical to assume that a hypothetical willing buyer of the assignee interest could successfully pursue the remedy of judicial winding up under §37 to effectuate a liquidation.

The final section relied on by the government is TUPA §42:

**§ 42.  Rights of Retiring or Estate of Deceased Partner When the Business is Continued**
When any partner retires or dies, and the business is continued . . . without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have <u>the value of his interest</u> at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to <u>the value of his interest</u> in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided that the creditors of the dissolved partnership as against the separate creditors, or the representative of the retired or deceased partner, shall have priority on any claim arising under this Section as provided by Section 41(8) of this Act. (Emphasis added.)

---

[22] <u>See</u> II ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP §7.08(b)(7), at 7:125-26 (Supp. 1999-2).

15

The first clause of §42 indicates that when a partner dies, the surviving partners have the right to continue the dissolved partnership's business; and the parties to this appeal have stipulated that such a right exists.[23]  If the remaining partners exercise this right, the question becomes to what would a willing buyer of the 25 percent assignee interest at issue here be entitled.

Section 42 answers that the assignee is entitled to "the value of his interest."[24]  This answer obviously begs the question how to value that interest.  The government insists, in essence, that "the value of [the assignee's] interest" is an extension of the rights granted the assignee under §§ 26 and 27(2), i.e., a right to "his share of the profits and surplus."[25]  This is a reasonable

---

[23]The relevant stipulation provides: "As an alternative to liquidation, the remaining partners had the right to continue the business of the partnership, provided they paid the Estate the fair market value of the Decedent's interest as of the valuation date."

[24]As discussed in Cauble v. Handler, 503 S.W.2d 362 (Tex. App. 1974), in addition to the "value of his interest," the assignee has the choice of receiving either (1) interest on that value from the date of dissolution or (2) profits attributable to the use of his right in partnership property from the date of dissolution to the date that he receives the "value of his interest."  This additional right is not relevant for Federal Estate Tax purposes because of the date-of-death valuation rule: Estate assets are to be valued as of death and facts occurring after death can not properly be considered.  See Ithaca Trust Co. v. United States, 279 U.S. 151, 155 (1929); Estate of Smith, 198 F.3d at 521-22.

[25]TUPA § 26.  Although "surplus" is not defined in TUPA, Texas courts have held that "'[s]urplus' is the excess of assets over liabilities."  Bader v. Cox, 701 S.W.2d 677, 681 (Tex. App. 1986) (citing Fulgham v. Gulf, Colorado & Santa Fe Railway Co., 288 S.W.2d 811, 813 (Tex. App. 1956)).

interpretation; it is not, however, the _only_ reasonable interpretation. Another possibility, one forcefully advanced by the Estate, is that the assignee would be entitled to receive a sum equal to the price that his interest would command in the open market considering that it is a mere assignee interest and that its purchaser (at least potentially) will not enjoy liquidation rights. In this latter alternative, "the value of his interest" would reflect the undesirable, discount-producing characteristics attendant on ownership of an interest in a going concern that comprises an undesirable mix of assets, for which there is no ready market, and over which the minority owner lacks control.

There is substantial support for the Estate's position that "the value of his interest" is not synonymous with either a pro rata share of the partnership NAV (as the government's expert maintains) or a partner's share of the partnership "surplus" (an equivalent concept expressed in different terms).[26] First, the language of the UPA itself supports the Estate's argument. When the drafters wanted to grant liquidation rights to a departing _partner_, they did so expressly: §38(1) grants a _partner_, after dissolution, the right to be paid his share of the partnership's surplus. The drafters did this in the sections governing the rights of _partners_, but did not do so in §42, the section that controls the rights of _assignees_. _Inclusio unius est exclusio_

---

[26]_See_ _supra_ n.25.

17

_alterius_.

Second, we are aware of no Texas case that has squarely faced the question whether the phrase "the value of his interest" as used in §42 is congruent with pro rata share of NAV in the context of an assignee rather than a partner demanding to be bought out.[27] Cases from other jurisdictions that have addressed this issue in the context of the Uniform Act have held that the "value" owed to a partner's assignee is his pro rata share of the partnership's NAV, _less appropriate discounts_.[28]

---

[27]The government relies primarily on <u>Bader v. Cox</u>, 701 S.W.2d 677 (Tex. App. 1985). The central issue in <u>Bader</u> was whether a deceased law partner's widow was entitled to share in the proceeds of contingency fee contracts entered into by her husband's law partnership prior to his death. The court ruled that the widow was entitled to a share of the fees and remanded the case for a determination on value. There is language in <u>Bader</u> that supports the government's contention that "value of his interest" as used in § 42 is equivalent to "surplus," <u>see</u> <u>id.</u> at 681; given the absence of analysis, however, it would be a mistake to conclude that <u>Bader</u> conclusively establishes that "the value of his interest" and "surplus" are synonymous.

The government also cites to <u>Cauble v. Handler</u>, 503 S.W.2d 362 (Tex. App. 1973). The <u>Cauble</u> court stated that "it is section 38(1) of [TUPA] that gave the representative of the estate of the deceased partner the right to . . . have the partnership assets liquidated, the debts paid, and the share of each partner in the surplus paid to him in cash." As explained above, § 38(1) applies, by its express terms, to <u>partners</u>, not to assignees. Quite simply, this statement in <u>Cauble</u> is based on a misapprehension of the applicable law. <u>See</u> Alan R. Bromberg, <u>Partnership Dissolution—Causes, Consequences, and Cures</u> 43 Tᴇx. L. Rᴇv. 631, 648 (1965). <u>See also</u> <u>King v. Evans</u>, 791 S.W.2d 531 (Tex. App. 1990) (analyzing the rights of a withdrawing <u>partner</u>, not the rights of an assignee).

[28]<u>See</u> <u>Estate of Watts v. Commissioner</u>, 823 F.2d 483, 487 (11th Cir. 1987) ("the interest held by [the decedent's estate] did not carry with it [liquidation rights]. We therefore conclude that the tax court was correct . . . in determining that the value of [the

18

Third and finally, a change effected by the Revised Uniform Partnership Act ("RUPA")[29] suggests that the phrase "value of his interest" in UPA §42 is ambiguous. RUPA §701(b) states that a disassociated partner has the right to be paid the "buyout price"[30] — a purposefully created term of art defined as "the greater of the liquidation value or the value based on a sale of the entire business as a going concern without the dissociated partner . . ." Comment (c) to the RUPA explains that "'[b]uyout price' is a new term. It is intended that the term be developed as an independent concept appropriate to the partnership buyout situation, while drawing on valuation principles developed elsewhere."[31] The Reporter for the Revision Project further explained that the new language is "intended to cut through some of the confusion in the

---

decedent's interest] could not be ascertained by reference to the value of that interest upon . . . liquidation"); see also Shopf v. Marina Del Ray Partnership, 549 So. 2d 833 (La. 1989) (construing the Louisiana Civil Code analogue to § 42); Hewitt v. Hurwitz, 592 N.E.2d 213 (Ill. App. 1992); II ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP § 7.13(b)(1) at 7:186-88 & n.15 (1992-2 Supp).

[29]The RUPA is codified in Texas as the Texas Revised Partnership Act, Tex. Rev. Civ. Stat. art. 6132b-1.01 et seq. It does not govern the partnership at issue in this case because the partnership did not so elect. See id. 6132b-11.03.

[30]This new statutory term employed by the model act was not adopted by the Texas legislature when it enacted the RUPA; instead, the Texas version of the RUPA uses the term "fair value." See Tex. Rev. Civ. Stat. art 6132-7.01(b).

[31]6 Uniform Laws Annotated 83 (1995 Master Edition).

cases . . . ."[32]  This satisfies us that the drafters of the new Uniform Act were convinced that the right to be paid a full pro rata share of the partnership's NAV was anything but a well-established right; to the contrary, they found substantial ambiguity in the existing statute and related case law.  If it had not been "broke" —— or badly bent —— the redactors would not have fixed it.

We need not and therefore do not attempt today to map the precise contours of the rights of an assignee of a  partner under the TUPA.  Nevertheless, because the hypothetical parties to the willing buyer-willing seller transaction are deemed to have "reasonable knowledge of relevant facts,"[33] we must assume that they would conclude, as we have, that the law is not well-settled —— that it is at best unclear and uncertain.

The district court grounded its holding in the premise that the law establishes to a legal certainty that the assignee of a partner has precisely the same liquidation rights as the assigning partner.  We reach the opposite conclusion, i.e., that this premise is <u>not</u> established to a legal certainty, and to hold that it is constitutes error. This error of law by the district court caused

---

[32]Donald J. Weidner, <u>Three Policy Decisions Animate Revision of the Uniform Partnership Act</u>, 46 Bus. Law. 427, 442 (Feb. 1991); <u>see also</u> Donald J. Weidner & John W. Larson, <u>The Revised Uniform Partnership Act: The Reporters' Overview</u>, 49 Bus. Law. 1, 11-12 (Nov. 1993).

[33]Treas. Reg. § 20.2031-1(b).

it to pretermit inquiry into the quantum of any lack-of-marketability discount, lack-of-control discount, and portfolio-mix discount that might be applicable in this case. Neither did the district court consider that this very legal uncertainty might itself be an independent factor depressing the price a willing buyer would pay (or a willing seller might expect to be paid) for the assignee interest. We do not go so far as to conclude that all of the discounts urged by the Estate are necessarily applicable in this case or to determine the correct percentage of those that might be; only that some or all might be applicable and that further fact-findings and legal determinations are necessary to determine which if any discounts should be applied and the quantum of each. On remand, the district court must consider evidence from both parties in light of our determination that the liquidation rights of an assignee are <u>not</u> clearly established but that, to the contrary, they are unsettled, and must determine the applicability of the various claimed discounts and the correct percentages of those that are found to apply.

G.    Administrative Expenses

The parties' pretrial order contains a stipulation that there is a contested fact issue regarding the reasonableness of the contingency fee agreement between the Estate and the attorney's prosecuting this action on the Estate's behalf. We do not find that the court has disposed of this issue. The Estate also complains on appeal that the district court failed to make a

21

factual determination regarding the deductibility of accountants' and appraisers' fees. The government did not respond to these arguments, and the record does not reflect what effect these deductions, if available to the Estate, might have on its refund claim. On remand, the district court must address these issues as well.

## III.

### CONCLUSION

For the forgoing reasons this case is reversed and remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED

22