IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 00-31292

ALVIN C. COPELAND,

Plaintiff-Appellant/Cross-Appellee,

versus

WASSERSTEIN, PERELLA & CO., INC.,
AND CHARLES G. WARD, III,

Defendants-Appellees/Cross-Appellants.

_____

Appeals from the United States District Court
For the Eastern District of Louisiana

_____

January 4, 2002

Before GARWOOD, WIENER, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

This Louisiana diversity case arises out of a food-business merger gone sour. Plaintiff-Appellant/Cross-Appellee Al Copeland owned the controlling interest in companies that sought to acquire a chain of restaurants and retained Defendant-Appellee/Cross-Appellant Wasserstein, Perella, & Co. ("Wasserstein") to provide financial advice regarding the deal. After the corporation that resulted from the merger was forced into bankruptcy by creditors, Copeland sued his investment banker, settled that lawsuit, and then sued Wasserstein and one of its executive employees, Defendant-Appellee/Cross-Appellant Charles Ward. Copeland appeals from the

district court's dismissal of his claims against Wasserstein and Ward, and they cross-appeal from the district court's denial of their motion for sanctions. We affirm the district court's dismissal of Copeland's claims; we reverse the court's denial of Wasserstein and Ward's motion for sanctions and remand for further proceedings consistent with this opinion.

## I.

### FACTS AND PROCEEDINGS

In June of 1988, a corporation controlled by Copeland, A. Copeland Enterprises, Inc. ("Old ACE"), and its wholly-owned acquisition subsidiary, Biscuit Investments, Inc. ("Biscuit"), signed an engagement letter with Wasserstein, a New York investment bank boutique. This agreement committed Wasserstein to serve as the "exclusive financial adviser" to Old ACE and Biscuit in connection with their prospective acquisition of Church's Fried Chicken ("CFC"). Acting chiefly through Ward, its Vice Chairman, Wasserstein devised a merger financing plan that contemplated finding an unsecured, subordinated lender that would commit to provide Biscuit a bridge loan and underwrite high-yield or "junk" bonds to capitalize the merged corporation. As Wasserstein lacked underwriting capacity, Biscuit solicited proposals for the unsecured financing, eventually choosing Merrill Lynch ("Merrill") as the subordinated lender. Merrill lent Biscuit $173 million to fund its tender offer for CFC. This loan was conditioned on

2

Copeland's contributing specified recipe royalties and the franchising arm of Old ACE to Biscuit. Copeland testified in the instant litigation that this condition was agreed to and complied with in reliance on advice from Wasserstein and Ward.

The tender offer closed on March 21, 1989. Biscuit acquired 86.5% of CFC's shares and paid Wasserstein the balance of the fees owed under the engagement letter.

The terms of the bridge loan, which was by then in place, gave Merrill the right to designate two individuals to serve on Biscuit's board of directors. Six days after the closing of the tender offer, Merrill designated — and Copeland elected as directors — both Ward and Raymond Minella, the lead Merrill executive handling the merger. Ward agreed to serve only after Minella orally promised that Merrill would indemnify Ward for claims arising out of his service on Biscuit's board of directors. These two continued to serve on that board until September, 1989, when Biscuit merged into CFC, which thereupon changed its name to Al Copeland Enterprises, Inc. ("New ACE"). Copeland was the CEO and chairman of New ACE and owned all of its common stock. Again on Merrill's designation, Copeland elected Minella and Ward to serve as directors of New ACE. Ward served until January 1990, when he resigned after learning that Merrill would not indemnify him after all.

Flash back to 1988: Biscuit received a letter from Merrill stating that Merrill was "highly confident" that it could sell up

3

to $200 million worth of junk bonds to capitalize New ACE; however, Merrill never took the bond issue to market. This lack of long-term financing prompted New ACE's creditors, including Merrill itself as the bridge lender, to put New ACE into involuntary bankruptcy in 1991.

The following year, 1992, Copeland personally sued Merrill, alleging negligence and breaches of contractual and fiduciary duties, and claiming damages resulting from the salary he lost, the royalties he had foregone, and the assets he had contributed to Biscuit. Merrill and Copeland finally settled that litigation in 1997: Merrill agreed to pay Copeland a substantial sum of money; Copeland agreed to release all claims against "Merrill Lynch, its past, present, and future officers, directors, employees, agents [and] representatives" (emphasis ours).

After settling with Merrill, Copeland filed the instant action against Wasserstein and Ward in Louisiana state court. Copeland alleged that Wasserstein, as a financial adviser to the corporations, and Ward, as a director of Biscuit and its successor, New ACE, had breached duties they owed to Copeland individually, had failed to disclose material information to him, and had caused him to rely detrimentally on their negligent or fraudulent misrepresentations. The gist of Copeland's allegations was that Wasserstein and Ward knew or should have known — but failed to disclose to Copeland — that, among other things, (1) the merger and financing plans were unworkable or unsound, (2) the Merrill

4

"deal team" had no junk-bond experience, and (3) the junk-bond market had ceased to exist before Biscuit's acquisition of CFC closed.

Both Wasserstein and Ward removed Copeland's state-court suit to the Eastern District of Louisiana on diversity grounds and subsequently filed motions to dismiss pursuant to Rule 12(b)(6). The district court granted Wasserstein's motion, holding that it owed no fiduciary duty to Copeland personally and, alternatively, that his claims, which the court categorized as sounding in tort rather than in contract, had prescribed. The court denied Ward's dismissal motion, however, concluding that Copeland had pled (1) a conflict-of-interest claim that could support a fiduciary-duty claim and (2) a special-relationship claim that could support a nonderivative cause of action.

In 2000, Ward filed a summary judgment motion grounded in, inter alia, release, prescription, lack of standing, and absence of causation. In due course, the district court granted Ward's motion and dismissed Copeland's claims against him, stating that it "primarily rel[ied] upon...the threshold issue, and that is the effect of that settlement agreement between Copeland and Merrill Lynch," in which Copeland had released, among others, Merrill's "representatives." In addition to dismissing all claims against both Wasserstein and Ward, the court awarded them costs.

Ward and Wasserstein had filed a motion for sanctions against Copeland and his counsel on the theory that they knew when the case

5

was filed that it was time-barred and otherwise meritless.  After analyzing the motion from the bench, but discussing only the release issue in any detail, the trial court orally denied Wasserstein and Ward's motion for sanctions.

After final judgment issued, Copeland timely appealed the district court's grants of Wasserstein's 12(b)(6) motion and Ward's summary-judgment motion, as well as the award of costs. Wasserstein and Ward timely cross-appealed the court's denial of their motion for sanctions.

## II.

### ANALYSIS

#### A.   **Standards of Review**

We examine a district court's grants of

both a motion to dismiss and a motion for summary judgment under a de novo standard of review.  In the former, the central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief.  In the latter, we go beyond the pleadings to determine whether there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.[1]

By contrast, we review the denial of sanctions and the allocation

---

[1] See St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 440 n.8 (5th Cir. 2000) (citing Lowrey v. Texas A & M University System, 117 F.3d 242, 247 (5th Cir. 1997), and Fed. R. Civ. P. 56(c)).

of costs for abuse of discretion.[2]

B.    **Fiduciary Duty of Wasserstein**

Copeland appeals the district court's dismissal of his claim that Wasserstein breached a fiduciary duty.  In the district court, the parties disputed (1) whether an investment bank acting as a financial adviser owes a corporate client any fiduciary duty; (2) whether, if such a duty is owed, a controlling shareholder can maintain a cause of action for breach of such a duty to the corporation; and (3) whether a claim for the breach of such a duty prescribes in one year or in ten.  The first two issues present novel questions of Louisiana law, but we have often distinguished tort claims from contract claims for purposes of prescription. Thus, the third issue — prescription — implicates Louisiana law that is settled, invoking a line of cases that resolves this claim in Wasserstein's favor.  As we conclude that Copeland's claims against Wasserstein have prescribed, we do not address the first two questions.

Even when we assume without deciding that (1) Wasserstein owed a fiduciary duty to Biscuit and Old ACE, and (2) Copeland's alleging a breach of Wasserstein's fiduciary duty would entitle him to sue Wasserstein directly, we are convinced that this purported cause of action has prescribed.  Under Louisiana law, a claim for breach of a fiduciary duty is generally personal and prescribes in

---

[2]<u>Hogue v. Royse City, Texas</u>, 939 F.2d 1249, 1256 (5th Cir. 1991).

7

ten years, and a negligence claim is delictual and prescribes in one year.[3] We have recognized this dichotomy in a long line of cases involving well-recognized categories of fiduciaries, producing a general rule that if a plaintiff fails to allege self-dealing, breach of the duty of loyalty, fraud, or breach of trust on the part of his fiduciary, the plaintiff's claim sounds in negligence and is subject to a one-year prescriptive period.[4] The district court relied on this line of cases for its conclusion that, because Copeland's claim against Wasserstein was "best characterized as tort in nature," a one-year prescriptive period applied.

The trial court correctly characterized the gravamen of Copeland's case. His petition lays out in its count against Wasserstein a litany of instances in which Wasserstein allegedly knew or should have known, but failed to disclose, facts key to shaping Copeland's understanding of the transaction and his

---

[3]Compare LA. CIV. CODE art. 3499 (personal actions) with LA. CIV. CODE art. 3492 (negligence actions).

[4]FDIC v. Abraham, 137 F.3d 264, 266–67, 269–70 (5th Cir. 1998) (holding that the FDIC's claim against corporate directors for violation of fiduciary duty sounded in tort as a violation of the duty of care, and therefore prescribed in one year); FDIC v. Barton, 96 F.3d 128, 133 (5th Cir. 1996) (distinguishing the mandatary's fiduciary duty from the duty of care, and applying a one-year prescriptive period to a violation of the latter by a board of directors); Gerdes v. Estate of Cush, 953 F.2d 201, 205 (5th Cir. 1992) ("While a mandatary is a fiduciary, it does not necessarily follow that every action against a mandatary is subject to the ten year prescriptive period.... In the absence of self-dealing or a breach of the duty of loyalty, negligence by a mandatory is subject to the one year prescriptive period.").

willingness to go forward with it. Even if proven, however, these failures would be violations solely of Wasserstein's professional duty of <u>care</u>. In an effort to invoke Louisiana's ten-year period of liberative prescription, Copeland has attempted to make out two conflicts of interest that would transmogrify these violations into breaches of Wasserstein's duty of <u>loyalty</u>. But the first alleged conflict —— that a contingency fee biased Wasserstein toward pushing the deal through —— sweeps too broadly, both because the engagement letter fully disclosed the fee arrangement and because such arrangements are common practice in the investment banking industry. The second alleged conflict —— that because Wasserstein lacked underwriting capacity, it favored maintaining its business relationship with Merrill over its duty to advise Copeland's companies —— is not alleged in the complaint and presents a contention first raised on appeal, and therefore is not an argument that we will entertain.[5]

To summarize, Copeland failed to plead facts that would bring his fiduciary-duty claim under a ten-year prescriptive period. The district court thus properly dismissed this claim against Wasserstein on Louisiana's one-year period of liberative prescription for delictual claims.

C. **Detrimental Reliance on Wasserstein**

---

[5]<u>Yohey v. Collins</u>, 985 F.2d 222, 225 (5th Cir. 1993) ("As a general rule, this Court does not review issues raised for the first time on appeal.").

Copeland also appeals from the district court's Rule 12(b)(6) dismissal of his claim that he detrimentally relied on Wasserstein's assurances regarding Merrill and the merger financing plan. The district court found that this claim too had prescribed in one year; that because the claim was "based on a failure to meet professional obligations or competence," it was "rooted in tort."

Consequently, even if under Louisiana law Copeland could justifiably rely on Wasserstein's representations regarding third parties, any detrimental-reliance claim arising out of the merger has prescribed. The prescriptive period is not determined by the label of the cause of action but by "the nature of the transaction and the underlying basis of the claim."[6] We acknowledge that in Stokes v. Georgia Pacific Corp.,[7] we stated that an action based on a detrimental-reliance theory sounds in contract. Stokes was a classic detrimental-reliance case, however, in which a supplier made substantial investments relying on a customer's assurances of future purchases. Jurisprudence of the Supreme Court of Louisiana on prescription binds us in diversity, and that court reasoned in Roger v. Dufrene that "[i]t is the nature of the duty breached that should determine whether the action is in tort or in contract."[8]

---

[6]Davis v. Parker, 58 F. 3d 183, 189 (5th Cir. 1995).

[7]894 F.2d 764, 766-67 (5th Cir. 1990).

[8]Roger v. Dufrene, 613 So.2d 947, 948 (La. 1993) ("The proper prescriptive period to be applied in any action depends upon the nature of the cause of action.").

10

Therefore, although nonfeasance in the performance of an obligation creates a cause of action that prescribes in ten years, misfeasance in the performance of a contract for professional services, such as those provided by a lawyer, doctor, accountant, or insurance agent, gives rise to a claim in tort, which prescribes in one year.[9] The Roger court explained this distinction between misfeasance and nonfeasance as follows:

> The nature of certain professions is such that the fact of employment does not imply a promise of success, but an agreement to employ ordinary skill and care in the exercise of the particular profession. The duty imposed upon the insurance agent as well as [the lawyer, doctor, and accountant] upon whose advice the client or patient depends is that of "reasonable diligence" a breach of which duty results in an action in negligence.[10]

We discern no valid reason to treat a financial adviser such as Wasserstein differently. Wasserstein can reasonably be thought to have promised only to advise Old ACE and Biscuit diligently, in accordance with the standard of care among financial advisers. Copeland claims that Wasserstein's advice fell short of that standard; but this states a quintessentially delictual claim that prescribed years ago, regardless of whether he might now characterize it as a detrimental-reliance claim.

The district court also properly dismissed as prescribed Copeland's claims of negligent or intentional misrepresentation,

---

[9] Id. at 949.

[10] Id.

11

which are also delictual.[11]  Having disposed of Copeland's claims against Wasserstein, we now turn to his appeal of the summary judgment dismissal of his claims against Ward.

D.  **Release of Ward**

Copeland's claim against Ward arises solely from Ward's service on boards of directors of Copeland's corporations — first Biscuit and then New ACE.  The district court orally granted Ward's motion for summary judgment because in Copeland's 1997 settlement with Merrill, he had released Merrill's "representatives."  The court found Ward, the director, to have been a "representative" of Merrill within the meaning of that release.  It reads in part:

> The settlement agreement hereby releases Merrill Lynch, its past, present and future officers, directors, employees, agents, [and] representatives...and the predecessors, successors, partners, heirs, spouses, executors, administrators, successors and assignees of any or all of them (hereinafter the "Releasees") from any and all claims, known or unknown, of any every kind whatever, whether or not enumerated or plead in this action, or any and all claims that have arisen at any time prior to the date this Settlement Agreement is executed...against Releasees by [ ] Copeland.
> ...
> This Settlement Agreement is binding upon and inures to the benefit of the Parties and of any agents, successors, predecessors, assigns and subrogees of the Parties. This Settlement Agreement creates no third party beneficiaries hereto, and it is not the intention of either party to

---

[11]See, e.g., In re Ward, 894 F.2d 771, 775 (5th Cir. 1990) ("The tort of negligent misrepresentation occurs when there is a breach of the duty to supply correct information to the plaintiff."); Doucet v. Lafourche Parish Fire Protection Dist. No. 3, 589 So.2d 517, 519 (La. Ct. App. 1991) ("Misrepresentation, intentional or negligent, is a delict; an unlawful act covered under LSA–C.C. article 2315.  'Delictual actions are subject to a liberative prescription of one year.'  LSA–C.C. art. 3492.").

12

create any such third party beneficiary rights.

We must construe this settlement agreement — a "transaction" in the lexicon of the Louisiana Civil Code — under article 3073:

> Transactions regulate only the differences which appear clearly to be comprehended in them by the intention of the parties, whether it be explained in a general or particular manner, unless it be the necessary consequence of what is expressed; and they do not extend to differences which the parties never intended to include in them.
> The renunciation, which is made therein to all rights, claims and pretensions, extends only to what relates to the differences on which the transaction arises.[12]

The burden of proving the scope of a release falls on the defendant, because the essence of release is res judicata, an affirmative defense.[13] Such proof can include reference to extrinsic evidence because, even though Louisiana courts generally interpret a contract from within its four corners, they "have crafted a special exception to the extrinsic evidence rule for compromise agreements."[14] Importantly, as the language of article 3073 suggests, if the releasor "did not intend to release certain aspects" of a claim, extrinsic evidence is admissible to establish "whether unequivocal language in the instrument was intended to be unequivocal."[15] Thus in <u>Brown</u>, the Louisiana Supreme Court held

---

[12]LA. CIV. CODE ANN. art. 3073.

[13]<u>Brown v. Drillers, Inc.</u>, 630 So.2d 741, 747–48 (La. 1994).

[14]<u>Id.</u> at 748.

[15]<u>Id.</u> at 749.

13

that the plaintiff had not intended to sign away her ability to bring a wrongful-death action growing out of an oil-rig accident in which her husband was mortally injured.[16] Key to this holding were facts that suggested no intent to injure and a statutory scheme that sharply distinguished between personal-injury and wrongful-death actions.[17] Here, the law may distinguish between Copeland's causes of action against Merrill and those against Ward, but the facts confirm that, from the beginning, Copeland himself thought of Ward as a Merrill "representative."

Two facts chiefly persuaded the district court that Ward, during his service on the boards of Biscuit and New ACE, was a "representative" of Merrill within the meaning of the settlement agreement's release clause. First, Ward stated that he served on the boards solely at the request of Merrill and then on the condition that Merrill indemnify him, which Minella orally promised it would do. The court properly credited this undisputed evidence. Second, Copeland and his counsel repeatedly characterized Ward as a "representative" of Merrill in testimony and pleadings ranging throughout this case, the prior suit against Merrill, and the New ACE bankruptcy proceeding.

Whether Copeland's arguments here totally founder on his previous characterizations of Ward as a "representative" of Merrill

---

[16]<u>Id.</u> at 752–57.

[17]<u>Brown v. Drillers, Inc.</u>, 630 So.2d 741, 751, 754–55 (La. 1994).

14

on the corporations' boards depends in part on the preclusive effect of those statements under Louisiana law.  Absent prejudice to an adverse party, he who has made an admission in a prior suit "is not barred from denying the facts contained in that admission in a subsequent suit."[18]  Even a party's testimony in the <u>same</u> proceeding does not conclusively bar his later allegations to the contrary.[19]  Thus Copeland's statements do not <u>ipso facto</u> preclude his asserting here that Ward was not a "representative." Nevertheless, in its summary judgment analysis, the trial court certainly could take such statements into account as evidence that

---

[18]<u>Alexis v. Metropolitan Life Ins. Co.</u>, 604 So.2d 581, 582 (La. 1992).  <u>Alexis</u> collected authorities on point:

> The allegation contained in the earlier...suit is not a judicial admission, with its conclusive effect, in the present proceeding.  <u>See</u> La. Civ. Code art. 1853.  The Louisiana jurisprudence is clear that such an "extra-judicial" confession does not bind the claimant in subsequent litigation.  S. Litvinoff, THE LAW OF OBLIGATIONS, p. 426 in 5 LA. CIV. LAW TREATISE (1992); <u>Succession of Turner</u>, 235 La. 206, 103 So.2d 91 (1958), and authorities cited therein.  The party who has made such an admission in a previous suit is not barred from denying the facts contained in that admission in a subsequent suit, unless the adverse party has been prejudiced by his reliance upon that admission.  <u>Id.</u> Rather, the admission is to be given the probative value it deserves as an admission of the party who made it. <u>See</u> LA. C.E. art. 801(D)(3); <u>Farley v. Frost-Johnson Lumber Co.</u>, 133 La. 497, 63 So. 122 (1913); Pugh, <u>Admissions and Confessions</u>, in <u>The Work of the Louisiana Supreme Court for the 1957-1958 Term--Evidence</u>, 19 La. L. Rev. 294, 434 (1959).

[19]<u>Scoggins v. Frederick</u>, 744 So.2d 676, 683 (La. Ct. App. 1999) ("[D]eposition testimony that a sale <u>was not</u> a simulation cannot be considered a judicial confession sufficient to estop [the deponent's] subsequent cross claim alleging that the sale <u>was</u> a simulation.") (emphases added).

15

Copeland understood Ward to be "representing" Merrill in some sense. We agree with the district court that Copeland's own references to Ward as Merrill's "representative," prior to signing the settlement agreement, suggest that Copeland would or should have understood that term in the agreement to include Ward.

We also take note, in our <u>de novo</u> review, of several further undisputed facts. By the time Ward was designated by Merrill as one of the two directors on Biscuit's board, Ward's services to Copeland's corporations under the engagement letter had ceased altogether. It is clear, moreover, that Ward was serving on the New ACE and Biscuit boards as Merrill's watchdog, both to keep Merrill informed and to prevent Copeland from engaging in rapacious affiliate transactions. The bridge loan documents provided that the Merrill-designated directors —— in this event, Ward and Minella —— would remain on Biscuit's board "so long as the Bridge Financing remains outstanding" or until they resigned, and that they would have veto power over large transactions between Biscuit and its controlling shareholder, Copeland. As Copeland's counsel put it before the district court, "That was the sole basis on which [Ward and Minella] were there [on the boards] representing Merrill Lynch." Copeland himself summed up the situation by stating in a deposition that "Merrill Lynch had two positions on our board" and that he "had no choice" but to agree to the appointment of Ward as a director.

This evidence that Ward was a Merrill representative was

16

contraposed against only an affidavit from Copeland, executed late in the game, in which he asserted conclusionally that he had not intended to release Ward. The affidavit did not explain why Copeland had previously referred to Ward as a Merrill "representative." The district court therefore found Copeland's assertion "basically self-serving, indeed, not supported by his own sworn testimony at other times." We agree that even in this summary judgment posture, Copeland's description of his own intent, coming at the eleventh hour, rings hollow.

While the intent to compromise is usually, under Louisiana's transaction jurisprudence, an issue of fact that is not appropriate for summary judgment, this case involves the kind of "explicit and detailed" contract of compromise,[20] along with a set of almost uncontroverted facts, that would permit summary judgment in a Louisiana court. Similarly, under the federal rules, when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict.[21] This jurisprudential rule has evolved from cases in which opposing parties had provided the affidavit and the

---

[20]Hall v. Management Recruiters of New Orleans, Inc., 332 So.2d 509, 512 (La. Ct. App. 1976).

[21]S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.").

17

deposition; but it applies equally to situations such as this, when the affidavit contradicts prior sworn testimony by the affiant himself.[22]

Copeland's affidavit states that "Charles G. Ward, III was not a 'representative' of Merrill Lynch as that term was used in the Settlement Agreement." In stark contrast, Copeland's deposition, given under oath, reads as follows:

> Q. [Ward] was a representative of Merrill Lynch on the Board with Manella, correct?
> A. Correct. He was put on the Board by Merrill Lynch.
> Q. Right. And you agreed to that? Isn't that right?
> A. I had no choice.
> Q. But you did agree to that?
> A. With no choice I had to agree.
> Q. And you understood that Ward and Minella had these dual representations, correct?
> A. I had no choice in the matter. I understood it. I understood that one represented me separately from the other through the transactions, but I had no choice in who they picked to put on the Board.
> Q. Well, you agreed?
> A. If I had no choice — they said they have a choice, to pick two people. They gave me two names. What can I say?
> Q. Didn't you suggest that Ward go on?
> A. No. I don't recall suggesting that.
> . . .
> Q. You agreed that Merrill Lynch would be able to designate two representatives on the Biscuit and then Al Copeland Boards, right?
> A. That was part of the deal, yes.

Copeland's affidavit does not attempt to explain the contradiction

---

[22]See Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 137 n.23 (5th Cir. 1992); Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 228 (5th Cir. 1984) ("[T]he nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony.") (citing Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980)).

between his statement there that he did not intend to include Ward as a "representative" in the release and his deposition testimony that characterized Ward as a "representative."

Given that the discrete facts are undisputed, even when we, in our de novo review, view them in the light most favorable to Copeland, we reach the legal conclusion that Ward was released by Copeland when Copeland released Merrill's representatives from liability. In reaching this conclusion, both we and the district court are following our summary-judgment jurisprudence. We are satisfied that the district court correctly granted summary judgment for Ward.

Even though the district court decided Ward's motion on the release issue, it expressly acknowledged the presence of other potentially valid grounds for dismissing Copeland's claims against Ward on summary judgment. In like manner, we affirm on the release reasoning of the district court, yet our de novo review of the summary-judgment record and the applicable law convinces us that several of the alternative grounds — including prescription, causation, and the nonderivative posture of Copeland's suit — would likely support summary judgment for Ward equally well. Ward's causation argument is particularly well-taken. The acquisition closed on March 21, 1989, and Biscuit and Merrill entered into the necessary financing agreement on the same day; yet Ward did not join Biscuit's board until March 27. When Ward began his board service, therefore, it was too late for him to disclose

19

anything to Biscuit or Copeland that would have influenced Biscuit's decision to enter into the obligations that eventually bankrupted its successor.

E.  **Allocation of Costs**

Copeland also appeals the district court's award of $23,092 in photocopying and videotaping expenses incurred by Wasserstein and Ward.  Contending that Wasserstein and Ward inadequately documented these claims, Copeland cites cases from other circuits and districts for the proposition that Wasserstein and Ward should have itemized their bill.  The applicable local rule, however, does not mandate itemization.[23]  Moreover, the record reveals that in fact counsel for Wasserstein and Ward did provide detailed documentation and made the requisite declaration under penalty of perjury.  The district court did not abuse its discretion in awarding costs to Wasserstein and Ward.

III.

**CROSS APPEAL**

Wasserstein and Ward have cross-appealed the district court's

_____

[23]E.D. LA. L.R. 54.3:
Within 30 days after receiving notice of entry of judgment, unless otherwise ordered by the court, the party in whose favor judgment is rendered and who claims and is allowed costs, shall serve on the attorney for the adverse party and file with the clerk a notice of application to have the costs taxed, together with a memorandum signed by the attorney of record stating that the items are correct and that the costs have been necessarily incurred.

20

denial of their motion for sanctions against Copeland and his counsel. As an initial matter, we reject Copeland's contention at oral argument that Wasserstein did not preserve the sanctions issue for its cross appeal. Even though the sanctions motion itself contains Ward's name alone as movant, the contemporaneously filed memorandum in support of that motion, to which the motion itself expressly refers, names both Wasserstein and Ward as movants. When we review the motion and the memorandum in pari materia, we are satisfied that the motion was made on behalf of both parties. Wasserstein's cross appeal is thus properly before us.

Wasserstein and Ward charge here, as they did in the district court, that Copeland and his lawyer are sanctionable on three distinct grounds. First, they contend that in filing this lawsuit, counsel violated his duty of reasonable inquiry under Article 863 of the Louisiana Code of Civil Procedure because he knew that Copeland's claims had prescribed, that Ward could not have caused Copeland's injuries, and that Copeland had released Ward. Second, Wasserstein and Ward seek sanctions under 28 U.S.C. § 1927 and Federal Rule of Civil Procedure 11 as well, contending that, to prevent the district court from granting Ward's 12(b)(6) motion, Copeland and his attorney essentially fabricated a conflict of interest that they knew did not exist. Third, Wasserstein and Ward repeat their urging before the district court that it sanction Copeland and counsel under Federal Rule of Civil Procedure 37 because they refused to produce copies of tax returns or the

21

settlement agreement with Merrill until the court was required specifically to order them to do so.

We review a district court's denial of sanctions for abuse of discretion.[24] It is well settled that, to conduct our review, we must be able to understand the district court's disposition of the sanctions motion.

> Although an award of attorney's fees, like an award of costs, is committed to the discretion of the trial court and can only be reversed for an abuse of discretion, the trial court must give reasons for its decisions regarding attorney's fees; otherwise, we cannot exercise meaningful review.... Where a district court fails to explain its decision...[,] we do not know whether the decision was within the bounds of its discretion or was based on an erroneous legal theory.[25]

A trial court may make "oral findings of fact" on a sanctions motion,[26] and we do not require district courts to make specific findings of fact and conclusions of law in every sanctions case. The degree and extent to which a specific explanation must be contained in the record on appeal will vary according to the particular circumstances of the case, including the severity of the violation, the significance of the sanctions, and the effect of the

---

[24]Hoque v. Royse City, Texas, 939 F.2d 1249, 1256 (5th Cir. 1991) (regarding Rule 11 sanctions).

[25]Schwartz v. Folloder, 767 F.2d 125, 133 (5th Cir. 1985). The Schwartz Court remanded a case for a "brief statement of reasons" justifying the denial of attorney's fees. Id. at 134.

[26]Id. at 133.

22

award.[27]

Here, in ruling from the bench on the sanctions motion, the district court dismissed Wasserstein's and Ward's multifarious arguments summarily and in the broadest terms. The court did not discuss each allegation of sanctionable conduct or give its reasons for dismissing each. Rather, the court stated globally that it had "no reason to believe that counsel here acted with any intentional or even negligent capacity for proceeding with an action that he knew or should have known would not ultimately be viable." On the release issue, the court described Copeland's argument as "an interesting point, a point I disagree with," but not a "totally untenable" position. "Therefore," the court concluded, "the motion for sanctions are [sic] denied." The court never addressed Ward and Wasserstein's argument for sanctions based on causation, or their allegation that Copeland's conflict-of-interest argument was baseless, or their belief that he had no standing to bring a nonderivative claim, or their charge that he abused the discovery process.

We do not relish prolonging secondary litigation such as this any further than necessary, but we are simply unable to review this issue on appeal without at least a brief statement, on each point, of the reasons for denying sanctions from the perspective of the

_____

[27]Thomas v. Capital Security Services, Inc., 836 F.2d 866, 882-23 (5th Cir. 1988). Here, Ward has alleged legal expenses of "hundreds of thousands of dollars."

23

judge best positioned to expound on these matters. Our constricted review of the motion in its current condition does suggest that it also raises issues of promptness and of shelter under Rule 11's 21-day safe harbor, which due process may require. With no intention to imply how this issue should come out in the end, we reverse and remand for more detailed findings with respect to Ward and Wasserstein's motion for sanctions, including a fuller explication of the court's ruling. In so doing, we leave to the sound discretion of the district court the determination of what further proceedings, if any, may be necessary or desirable.

## IV.

## CONCLUSION

We affirm the district court's 12(b)(6) dismissal of the claims against Wasserstein as prescribed and its summary judgment dismissal of the claims against Ward as released. We also affirm the award of costs to Wasserstein and Ward. As for sanctions, however, we reverse and remand for a more thorough analysis and explication by the district court, whichever way Wasserstein's and Ward's sanctions motion might be decided on remand.

AFFIRMED in part, REVERSED in part, and REMANDED.