# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 10, 2010

No. 09-60085

Lyle W. Cayce
Clerk

WHITEHOUSE HOTEL LIMITED PARTNERSHIP; QHR HOLDINGS - NEW ORLEANS LIMITED, Tax Matters Partner,

Petitioners - Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee

Appeal from the United States Tax Court
No. 12104-03

Before BARKSDALE, GARZA, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

This appeal by Whitehouse Hotel Limited Partnership, a Louisiana limited partnership, concerns the allowable amount for its claimed $7.445 million charitable-contribution deduction for its donation, in 1997, of a historic-preservation facade easement. The easement burdens the Maison Blanche building, owned by Whitehouse and located in New Orleans. In tax court, Whitehouse challenged the Commissioner of Internal Revenue's decision, in 2003, which disallowed $6.295 million of the amount claimed for the undisputed qualified conservation easement and imposed an underreporting penalty for 40% of the portion of underpayment of taxes due for tax-year 1997.

No. 09-60085

Here, Whitehouse challenges the tax court's agreeing both with most of that disallowance and with the penalty. Primarily at issue is whether the tax court properly considered the easement's effect on Whitehouse's opportunity to build on top of a building also owned by Whitehouse and contiguous to the Maison Blanche building. VACATED and REMANDED.

I.

Whitehouse was formed in 1995 for the purpose of purchasing and renovating a parcel of New Orleans property. The parcel is contained within both the Vieux Carré Historic District, as listed in 1966 in the National Register of Historic Places, and the Canal Street Historic District (part of the Central Business District).

This property included the Maison Blanche building (constructed between 1906 and 1908), which consists of a base level with six floors, a U-shaped tower with eight floors, and two subsequently constructed annexes with five and six floors, respectively. In 1980, the Maison Blanche building was designated as a City of New Orleans landmark.

The property also included the six-story Kress building (constructed in 1910) that is contiguous to the Maison Blanche building on Canal Street; and a parking garage contiguous to the Kress building (Kress garage). Whitehouse also owned a second parking garage located across Iberville Street from the block containing the above-described Maison Blanche and Kress buildings and the Kress garage.

Whitehouse purchased the underlying land and these buildings, with plans to renovate the buildings into, *inter alia*, a Ritz-Carlton hotel. Subsequent to the donation of the historic-preservation facade easement, the property within the above-described block was developed into a 452-room Ritz-Carlton Hotel with a spa and parking garage; a 230-room Iberville Suites Hotel; a 75-room Maison Orleans Hotel; and retail space.

2

No. 09-60085

On 29 December 1997, Whitehouse conveyed the easement to the Preservation Alliance of New Orleans d/b/a Preservation Resource Center (PRC), a nonprofit corporation. As noted, the Maison Blanche and Kress buildings were under common ownership when the easement was granted.

The easement prohibits alterations to the Maison Blanche building's facade, made primarily of terra-cotta. The white-glazed terra-cotta facade is covered with ornate baroque-inspired decorations, including two-story columns topped by an elaborate string course with garlands and lions' heads.

The easement requires Whitehouse to maintain the terra-cotta facade in a "good and sound state of repair". And, regarding the prohibition against altering the facade, the easement prohibits, *inter alia*, any construction or alteration that would affect the appearance of

> the exterior walls of the Lower Stories which are visible from Canal and Dauphine Streets, the exterior portion of the Improvement above the Lower Stories which is not covered by the Upper Stories, [and] the exterior walls of the Upper Stories which are visible from Canal, Burgundy, Iberville, and Dauphine Streets.

Moreover, pursuant to the easement, PRC approved specific development plans for the contiguous Maison Blanche and Kress buildings. For a point critical to this appeal, those plans did *not* include construction on top of the Kress building.

Concerning the requirement to maintain the Maison Blanche building's facade in a "good and sound state of repair", the easement obligates the Maison Blanche building's owner to, *inter alia*: "make certain improvements to the Facade which shall have a cost of at least $350,000"; perform and pay for work deemed necessary by PRC in order to preserve, maintain, or repair the facade and the building's structural elements; provide and pay for periodic inspections; and, "in the event of a change in conditions which would give rise to the judicial

3

No. 09-60085

extinguishment" of the facade restrictions, provide PRC at least ten percent of the proceeds of a subsequent transfer of the building. Testimony at the trial in tax court in 2006 established that, since conveying the easement, Whitehouse had spent $7.792 million repairing and restoring the terra-cotta facade, not including $421,000 to repair damage from Hurricane Katrina.

The day after Whitehouse executed and donated the easement, Whitehouse converted the Maison Blanche and Kress buildings into a single, indivisible condominium unit: Unit RC. That same day, Unit RC was conveyed to RC Hotel, L.L.C.

In its tax return for 1997, Whitehouse claimed a $7.445 million charitable-contribution deduction for the conservation easement. *See* 26 U.S.C. § 170 (allowing deductions for charitable contributions, including "qualified conservation contributions"). For doing so, and consistent with IRS regulations, Whitehouse obtained a contemporary appraisal of the easement. *See* 26 C.F.R. § 1.170A-13(c)(2)(i)(A) (requiring donor to obtain "qualified appraisal" to substantiate value of deduction). Richard Cohen performed this appraisal, which valued the easement at the above-referenced $7.445 million. It is undisputed that this easement constitutes a "qualified conservation contribution" under 26 U.S.C. § 170(f)(3)(B)(iii) and 26 C.F.R. § 1.170A-14; only the allowable amount of the deduction is at issue.

In 2003, through a Notice of Final Partnership Administrative Adjustment, Commissioner allowed $1.15 million for the easement, approximately $6.3 million less than claimed. In addition, Commissioner assessed a gross undervaluation penalty of 40% of the portion of underpayment of taxes for that year. *See* 26 U.S.C. § 6662 ("Imposition of accuracy-related penalty on underpayments").

Whitehouse challenged both assessments in tax court. *See generally Whitehouse Hotel Ltd. P'ship v. Comm'r*, 131 T.C. 112 (2008). There, both

No. 09-60085

Whitehouse and Commissioner presented expert testimony on both the easement's fair market value and the difference in the property's before- and after-easement values, *see* 26 C.F.R. § 1.170A-14(h)(3)(i).  A serious illness prevented Cohen, who prepared the underlying appraisal for the deduction, from participating at trial; therefore, Richard Roddewig provided the expert testimony for Whitehouse.  Dunbar Argote did so for Commissioner.

Both Roddewig and Argote have extensive experience in valuing real estate.  Roddewig is a lawyer as well as a real-estate consultant and appraiser; among other relevant experience, he had authored published works on preservation easements and contributed to *The Conservation Easement Handbook*.  Argote had valued between 50 and 70 buildings intended for use as hotels in New Orleans, including this being his fourth appraisal of the Maison Blanche building.

Both experts' written reports constituted their direct testimony at trial, on which they were cross-examined.  The outcome before the tax court largely turned on the these expert opinions, which the tax court discussed at length.  *See Whitehouse Hotel*, 131 T.C. at 121-46.

Among other things, the experts disagreed on two threshold issues:  which property should be valued; and the nature of its "highest and best use", which is, of course, a key factor in determining fair market value.  *See, e.g.*, *Stanley Works & Subsidiaries v. Comm'r*, 87 T.C. 389, 400 (1986) ("The fair market value of property reflects the highest and best use of the property on the relevant valuation date.").  Roddewig, for Whitehouse, determined the relevant property to consist of the Maison Blanche building (including annexes) and the contiguous Kress building, but *not* the Kress parking garage.  Argote, for Commissioner, valued only the Maison Blanche building (including annexes); Commissioner did not ask him to opine on any potential reduction in the Kress building's value.  *Whitehouse Hotel*, 131 T.C. at 126.  Restated, contrary to the basic regulatory

5

requirements, discussed *infra*, he did *not* consider the easement's impact on the contiguous and commonly owned Kress building. *See* 26 C.F.R. § 1.170A-14(h)(3)(i).

Roddewig also determined that the before-donation highest and best use of this property, at the time the easement was conveyed, was as a Ritz-Carlton hotel with 512 hotel rooms, an all-suites hotel with 268 rooms (for a total of 780 hotel rooms), and retail on the bottom floors. He found the after-donation highest and best use to be the same, but with only 720 hotel rooms. The 60-room difference (reduction) was pursuant to Roddewig's understanding that the easement precluded the possibility of building those rooms on top of the Kress building.

On the other hand, Argote concluded that the highest and best use of the Maison Blanche building (including its annexes) was as a mixed non-luxury hotel and retail complex, not a luxury hotel like the Ritz-Carlton. He also concluded that the easement did *not* limit the potential number of rooms. In other words, Argote opined the easement had no effect on Whitehouse's rights to construct additional rooms on top of the Kress building. In the light of this opinion, it is notable that Argote admitted to not having read the applicable treasury regulation (26 C.F.R. § 1.170A-14). Again, that regulation, discussed *infra*, requires, *inter alia*, considering the easement's effect on the fair market value of applicable contiguous property.

Each expert determined a value of the property he appraised for before and after the easement was donated, then subtracted the latter from the former. Roddewig's report used three recognized methods to reach a before-donation value: replacement-cost, income, and comparable-sales. These yielded the following before-donation values for the appraised property: $43 million for the replacement-cost method; $29.5 million for the income; and $40 million for the comparable-sales. Roddewig only reached an after-deduction figure under the

first two methods: $35 million for replacement-cost; and $18 million for income. He did not include an after-donation comparable-sales valuation because he did not find any sales of easement-encumbered properties in New Orleans that he considered comparable. Reconciling these values, Roddewig's final valuation set the before-donation value at $41 million and the after-donation value at $31 million, resulting in an easement value of $10 million.

In contrast, Argote used only the comparable-sales method. He concluded there was *no* difference in the before and after values of the property he appraised: each was $10.3 million. Accordingly, and rather extraordinarily, he assigned the easement a value of zero. *See, e.g.*, *Schwab v. Comm'r*, T.C. Memo 1994-232, 1994 WL 223175, at *11 (25 May 1994) ("We find it hard to imagine a prospective purchaser of a [tract of] land who would not have considered the restrictions of the open-space easement in determining the price."), *cited with approval in Hughes v. Comm'r*, T.C. Memo 2009-94, 2009 WL 1227938, at *15 (6 May 2009) ("[W]e disagree with [Commissioner's expert's] conclusion that the conservation easement may have had no, or only a nominal, impact on the fair market values of the [encumbered land]."). Notwithstanding Commissioner's expert's having valued the easement at zero, Commissioner continued to urge as the proper deductible amount the $1.15 million allowed in the above-referenced 2003 Notice of Final Partnership Administrative Adjustment.

A four-day trial was held in December 2006. The tax court's 64-page opinion was rendered almost two years later, with the final decision being entered in January 2009. *See Whitehouse Hotel,* 131 T.C. 112.

The tax court did not credit all of either expert's report and testimony, but undertook its own analysis, based on parts of each expert's evaluation. It disregarded as unreliable Roddewig's valuations under the replacement-cost and

income methods. *Whitehouse Hotel*, 131 T.C. at 152, 154-56 (explaining basis for finding replacement-cost and income methods unreliable).

Utilizing only the comparable-sales method, the tax court found a before-donation value of $12,092,301 and an after-donation value of $10.3 million, resulting in a charitable-contribution deduction of $1,792,301; accordingly, it ruled Whitehouse overstated the deductible amount by $5,652,699. *Whitehouse Hotel*, 131 T.C. at 171-72. The tax court's accepting Argote's exact after-donation value of $10.3 million resulted, at least in part, from its use of only the comparable-sales method. Because Roddewig did *not* engage in an after-donation comparable-sales valuation, the tax court relied on Argote's after-donation valuation (after rejecting Whitehouse's challenges to it). *See id.* at 168-71.

This gave rise to a potential penalty for gross valuation misstatement, with Whitehouse having had the opportunity at trial to show it satisfied the reasonable-cause exception. *See* 26 U.S.C. § 6664(c). As discussed *supra*, when it claimed the deduction, Whitehouse had relied on the contemporary appraisal prepared by Cohen. Whitehouse also presented testimony from Robert Drawbridge, the hotel's asset manager and an executive vice president of assets at Whitehouse's general partner and tax-matters partner. He testified that, in claiming the deduction, Whitehouse also relied on both another contemporary appraisal performed by Revac, Inc., and the professional advice of its lawyers and accountants.

The tax court ruled any reliance on the Revac appraisal was misplaced because it did not determine a value for the easement specifically. Further, because Drawbridge was not associated with Whitehouse until several years after the deduction was claimed, the tax court rejected as not credible his testimony regarding Whitehouse's efforts at the time it claimed the deduction. It therefore assessed a gross valuation misstatement penalty of 40% of the

portion of underpayment of 1997 taxes. *See Whitehouse Hotel*, 131 T.C. at 172-76.

## II.

On numerous bases, Whitehouse challenges the tax court's valuation of the conservation (facade) easement. Whitehouse also maintains the tax court erred by imposing the underreporting penalty.

In claiming the tax court undervalued the easement, Whitehouse contends: the court erred in admitting Argote's report based on his qualifications and his report's reliability; had the report been excluded, the court's failure to shift the burden of proof would constitute reversible error; and, even if Argote's report was admissible, it lacked such credibility that the tax court's placing any weight on it constituted an abuse of discretion and contributed to the tax court's erroneous valuation of the easement. Whitehouse's contention regarding Argote's report's credibility revolves largely around his failure to consider the effect the easement had on the right to construct additional rooms on top of the contiguous Kress building. Similarly, its challenge to the tax court's decision turns primarily on the tax court's failure to properly account for the easement's precluding building on top of that building.

The National Trust for Historic Preservation in the United States filed an amicus brief, pointing out that valuation of preservation easements is a fundamentally important issue to National Trust because, if such easements are deemed to have little or no value, the tax incentives Congress has established to encourage preservation would be severely weakened. National Trust also challenges Argote's appraisal and the court's conclusions, and asserts that the court's decision, if allowed to stand, will obscure the proper method for easement appraisals.

As a general rule, for charitable gifts of property, a taxpayer is "not allowed to take a deduction if the charitable gift consists of less than the

No. 09-60085

taxpayer's entire interest in that property". *Glass v. Comm'r*, 471 F.3d 698, 706 (6th Cir. 2006). An exception to this rule is for a "qualified conservation contribution". *Id.* (citing 26 U.S.C. § 170(f)(3)(B)(iii)); *see also* Stephen J. Small, *The Tax Benefits of Donating Easements in Scenic and Historic Property*, 7 REAL EST. L.J. 304, 305 (1979) (noting Congress "made the basic policy decision that the preservation of historic property is a worthy goal and one that is appropriate to encourage through the medium of the tax code"). This exception has existed in its current form since 1980. *See* Pub. L. No. 96-541, § 6 (1980).

To constitute a "qualified conservation easement", the contribution must be "(A) of a qualified real property interest, (B) to a qualified organization, [and] (C) exclusively for conservation purposes". 26 U.S.C. § 170(h)(1). These requirements are defined in the statute's subsequent subsections. *See* 26 U.S.C. § 170(h)(2), (3), (4). Such an easement must "be based upon legally enforceable restrictions that will prevent uses of the retained interest in the property that are inconsistent with the conservation purposes of the contribution". *Simmons v. Comm'r*, T.C. Memo 2009-208, 2009 WL 1950610, at * 4 (15 Sept. 2009).

As noted *supra*, Commissioner agrees that the easement is a qualified conservation easement—only its value is at issue. In that regard, the Internal Revenue Service has provided regulatory guidance for valuing qualified conservation easements. *See* 26 C.F.R. § 1.170A-14(h). The "before and after" valuation approach is to be employed where, as here, there is no "substantial record of sales of easements comparable to the donated easement". *Id.*; *see also, e.g.*, *Richmond v. United States*, 699 F. Supp. 578, 581-84 (E.D. La. 1988) (valuing facade easement in Vieux Carré); *Hilborn v. Comm'r*, 85 T.C. 677, 688-700 (1985) (discussing background of before-and-after valuation method and applying it to value facade easement in Vieux Carré); *Simmons*, 2009 WL 1950610, at *8-11 (valuing facade easement); *Browning v. Comm'r*, 109 T.C. 303,

320-325 (1997) (discussing and applying before-and-after valuation method in context of easement restricting development of land).

Notwithstanding this regulatory guidance, valuing preservation easements remains, most understandably, a complex and difficult undertaking that continues to challenge appraisers and the IRS. *See, e.g.*, *Bruzewicz v. United States*, 604 F. Supp. 2d 1197, 1205 (N.D. Ill. 2009) (referring to valuation of real-estate easements as an "esoteric and specialized" subject). This complexity is reflected, for example, by a guidebook devoted to appraising land-conservation and historic-preservation easements. *See* LAND TRUST ALLIANCE & NATIONAL TRUST FOR HISTORIC PRESERVATION, APPRAISING EASEMENTS (3d ed. 1999).

Louisiana law is applied for determining the rights transferred by the easement at issue. *See Adams v. United States*, 218 F.3d 383, 386 (5th Cir. 2000) ("To arrive at a reasonable conclusion regarding the value of the property at issue . . . , one must first determine the rights afforded to the owner of such property by the applicable state law."). Valuation is generally reviewed for clear error; but, of course, to the extent such valuation is predicated on "a legal conclusion regarding the rights inherent in the property", that conclusion is subject to *de novo* review. *Id.*; *see also Succession of McCord v. Comm'r*, 461 F.3d 614, 623 (5th Cir. 2006) ("The determination of the nature of the property rights transferred is a question of state law that this Court reviews *de novo*." (citing *Adams*, 218 F.3d at 386)).

Pursuant to Tax Court Rule 143(a), the Federal Rules of Evidence apply to trials in tax court. Similarly, its decisions are reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury". 26 U.S.C. § 7482(a); *Houston Oil & Minerals Corp. v. Comm'r*, 922 F.2d 283, 285 (5th Cir. 1991); *see also Green v. Comm'r*, 507 F.3d 857, 866 (5th Cir. 2007) ("We apply the same standard of review to decisions of the Tax

No. 09-60085

Court that we apply to district court decisions." (citing *Arevalo v. Comm'r*, 469 F.3d 436, 438 (5th Cir. 2006))).

### A.

### 1.

Whitehouse claims the tax court erred by admitting Argote's expert opinion. In doing so, Whitehouse challenges both Argote's qualifications and the reliability of his report and testimony. *See generally* FED. R. EVID. 702 (stating witness may qualify as expert through "knowledge, skill, experience, training, or education"); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (establishing district court as "gatekeeper" for admitting scientific expert testimony under Rule 702's five factors); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert* to apply to non-scientific experts). In *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000), our court noted that the importance of the trial court's gatekeeper role is significantly diminished in bench trials, as in this instance, because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence.

A tax court's admissibility determination for expert evidence is reviewed for abuse of discretion. *E.g.*, *Kumho Tire*, 526 U.S. at 142; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). "[A trial judge has] wide latitude in determining the admissibility of expert testimony, and 'the discretion of the trial judge and his or her decision will not be disturbed on appeal unless 'manifestly erroneous'". *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (quoting *Eiland v. Westinghouse Elec.*, 58 F.3d 176, 180 (5th Cir. 1995)). The same standard applies both for assessment of the witness' qualifications and for reliability determinations. *E.g.*, *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (qualifications); *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194-95 (5th Cir. 2006) (reliability). Accordingly, the tax court has broad

discretion to accept or reject all or part of an expert's opinion. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294-95 (1938).

a.

Whitehouse claims Argote's general qualifications as a real-estate appraiser do not give him the requisite "knowledge, skill, expertise, training, or education" to value historic-preservation facade easements. *See* FED. R. EVID. 702. "[T]he essential elements of the real estate expert's competency include his knowledge of the property and of the real estate market in which it is situated, as well as his evaluating skill and experience as an appraiser". *United States v. 60.14 Acres of Land*, 362 F.2d 660, 668 (3d Cir. 1966), *quoted with approval in Hidden Oaks*, 138 F.3d at 1050. In this light, Argote is qualified to offer expert opinion on the value of real estate in New Orleans. He is a licensed appraiser in Louisiana with over 25 years' appraisal experience, and he has appraised: 50 to 70 hotels between 1990 and 2000; commercial properties neighboring the Maison Blanche building; and the Maison Blanche building itself three times prior to the present case.

Whitehouse maintains, however, that a conservation-easement appraisal requires additional or different qualifications. In doing so, Whitehouse relies heavily on *Bruzewicz*, 604 F. Supp. 2d 1197. There, plaintiffs challenged Commissioner's disallowance of their claimed charitable-contribution deduction. *See id.* at 1199. The *Bruzewicz* district court held plaintiffs' failure to provide a "contemporaneous written acknowledgment" of the donation (as required by statute) was "alone fatal to their claimed deduction", but also noted that mere inclusion of the appraisers' license numbers in the appraisal did *not* constitute substantial compliance with the regulatory requirement that the appraisal provide the appraisers' qualifications. *Id.* at 1204-05.

Whitehouse incorrectly construes *Bruzewicz* as holding an appraisal license alone does not qualify a witness to offer expert testimony on conservation

easements.    *Bruzewicz* centers on appraisers' failure to include their qualifications in their report, *not* their substantive qualifications as appraisers. *See id.* at 1205.

Whitehouse also cites two decisions by our court that discuss excluded expert opinions:  *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 226 (5th Cir. 2007); and *Caracci v. Comm'r*, 456 F.3d 444, 451-52 (5th Cir. 2006).  Argote is, however, distinctly more qualified than the witnesses who offered those excluded opinions.

*Smith* affirmed the exclusion of a polymer scientist's opinion on whether a tire was defective.  495 F.3d at 226.  *Smith* held it was "the science's application to tires that concerns us here, and [the scientist] has absolutely no experience applying polymer science to tires".  *Id.* at 227.  Whitehouse's attempts to analogize a polymer scientist's qualifications to opine on tires to a real estate appraiser's qualifications to opine on an easement's effect on real estate's value are unpersuasive, especially in the light of Argote's noted qualifications. Likewise, *Caracci* is inapposite:  there, although critical of an expert, our court did not rule on his qualifications or even consider his opinion's admissibility. *See* 456 F.3d at 451-54, 58.

In sum, Whitehouse's contention that Argote was not sufficiently qualified to offer expert testimony on the easement's value fails.  A real-estate appraiser with his background is sufficiently qualified to value a specific type of property interest—even one as "esoteric and specialized" as a conservation easement, *Bruzewicz*, 604 F. Supp. 2d at 1205.   Finding Argote qualified was not a "manifestly erroneous" abuse of discretion, especially because of the diminished importance of the tax court's role, sitting without a jury, as a gatekeeper.  *See Gibbs*, 210 F.3d at 500.

14

No. 09-60085

b.

Whitehouse also contends Argote's report should have been held unreliable (and, therefore, inadmissible) because it failed to comply with the Uniform Standards of Professional Appraisal Practice (USPAP). In other words, Whitehouse casts USPAP compliance *vel non* as an issue of reliability (and thus admissibility), not credibility.

Whitehouse claims: both experts acknowledged they were bound by USPAP; Louisiana law requires that all licensed appraisers shall comply with USPAP; such compliance is required for all federally related transactions; and the IRS treats USPAP as providing the applicable appraisal standards. Further, Whitehouse claims Argote's valuation is merely *ipse dixit*, an insufficient basis upon which to admit opinion testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Whitehouse points to several instances where Argote's report allegedly fails to comply with USPAP standards. It is unnecessary, of course, to analyze each instance unless strict compliance with USPAP is required for the report to be *admissible*. Otherwise, the nature and extent of the deviations concern only the report's *credibility* (*i.e.*, the weight it should be given). Therefore, the threshold question is a legal one: whether strict compliance with USPAP is a pre-requisite for admissibility.

As the tax court noted, Whitehouse "has not cited any authority, nor do we know of any, for the proposition that an appraiser's compliance with USPAP is the sole determining factor as to whether an appraiser's valuation report is reliable". *Whitehouse*, 131 T.C. at 127. Especially in the light of the tax court's serving as the factfinder as well as the expert-testimony gatekeeper, Whitehouse has failed to show the court abused its discretion in treating the alleged USPAP violations as concerning credibility rather than admissibility. *See Gibbs*, 210

15

No. 09-60085

F.3d at 500 ("Most of the safeguards provided for in *Daubert* are not as essential . . . where a district judge sits as the trier of fact in place of a jury."). In other words, the tax court acted within its ample discretion in considering USPAP compliance as relevant to the *weight* Argote's report should be given, instead of whether it should be admitted.

c.

Whitehouse also contends the tax court erred in failing to shift the burden of proof from Whitehouse to Commissioner. Whitehouse asserts: the burden should have shifted because Whitehouse introduced credible evidence with respect to a factual issue, *see* 26 U.S.C. § 7491 ("Burden shifts where taxpayer produces credible evidence."); and, alternatively, Commissioner's assertion both at trial and in the post-trial brief that the donation value was zero (in contrast to the earlier Notice of Final Partnership Administrative Adjustment, which stated the deductible amount was $1.15 million) triggered the "new matter rule", *see* T.C. RULE 142(a)(1) (placing burden on petitioner with several exceptions, including one for "any new matter", for which it is on respondent). The tax court did not explicitly rule on the burden-shifting issue, and Whitehouse notes the court likely considered it moot because two experts' reports were weighed against one another.

"The allocation of the burden of proof is a legal issue reviewed *de novo*." *E.g.*, *Marathon Fin. Ins., Inc., RRG v. Ford Motor Co.*, 591 F.3d 458, 464 (5th Cir. 2009) (citing *Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 364 (5th Cir. 2009)). The tax court need not decide whether the burden shifted where, as here, both parties offered some admissible evidence. *Blodgett v. Comm'r*, 394 F.3d 1030, 1039 (8th Cir. 2005). "In a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance." *Id.*; *see also, e.g.*,

16

*Knudsen v. Comm'r*, 131 T.C. 185, 189 (2008) ("[A]n allocation of the burden of proof is relevant only when there is equal evidence on both sides. . . . In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof.").

Accordingly, Whitehouse's contention that the tax court erred in failing to shift the burden of proof is inextricable from its contention that Argote's opinion was inadmissible. Because Argote's opinion was admissible, as discussed *supra*, and because there is no indication that the tax court's decision turned on the allocation of the burden, there was no error in the tax court's not addressing the burden of proof. Therefore, it is unnecessary to analyze Whitehouse's contentions regarding *how* the burden shifted. (Along that line, as discussed, Commissioner at trial did *not* seek a lower donation value than the $1.15 million allowed in the notice in 2003.)

2.

Whitehouse next maintains the tax court erred by ignoring the income and replacement-cost valuation methods in favor of relying solely on the comparable-sales method. Again, "[v]aluation is a mixed question of law and fact, the factual premises being subject to review on a clearly erroneous standard, and the legal conclusion being subject to *de novo* review". *In re Stembridge*, 394 F.3d 383, 385 (5th Cir. 2004) (quoting *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 799 (5th Cir. 1997)). The tax court's determination of the proper fair-market-valuation method is a conclusion of law; thus, our review is *de novo*. *Cook v. Comm'r*, 349 F.3d 850, 853 (5th Cir. 2003) (citing *Estate of Dunn v. Comm'r*, 301 F.3d 339, 348 (5th Cir. 2002)).

Where, as here, there is no "substantial record of sales of easements comparable to the donated easement", *see* 26 C.F.R § 1.170A-14(h)(3)(i), there are three commonly recognized methods for valuing real property: comparable-

sales, income, and replacement-cost. *Hilborn*, 85 T.C. at 689; *see also* USPAP Standards Rule 1-4 (identifying three methods and noting each is to be used "when . . . necessary"). A description of the three methods follows.

Comparable sales are defined as "sales from a willing seller to a willing buyer of similar property in the vicinity at or about the same time" as the property being valued. *United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) (quoting *United States v. Trout*, 386 F.2d 216, 223 (5th Cir. 1967)). Our court has explained:

> As the definition indicates, comparability is largely a function of three variables: characteristics of the properties, their geographic proximity to one another, and the time differential. For any particular [valued] property, there may be an entire spectrum of comparable open market sales: from almost simultaneous sales of adjoining, virtually identical property to sales of such dissimilar and distant properties occurring so long ago that they are not in any sense of the term "comparable" sales. Generally, the more comparable a sale is, the more probative it will be of the fair market value of the . . . property [at issue]. In most cases, of course, there are no open market sales "ideally" comparable (*i.e.*, virtually identical characteristics, immediate vicinity, and within a short time of the [date on which property at issue was valued]), but instead an assortment of sales that are only reasonably comparable in all or several respects. Sound and just trial practice is to admit as many of the "most comparable" sales available as is necessary to fairly permit each side to present its argument of fair market value for the [fact-finder's] consideration.

*Id.* (footnotes omitted).

The income method involves analyzing data from comparable properties to determine the property's earnings capacity, operating expenses, and rates of capitalization and discount. This information is combined with any "reasonably clear and appropriate evidence" of future income potential and expenses to

estimate the property's value.  USPAP Standards Rule 1-4(c); *see also United States v. 6.45 Acres of Land*, 409 F.3d 139, 143 n.6 (3d Cir. 2005) (explaining that the "income capitalization approach" determines fair market value by dividing the "net income that a tract of land can produce in a typical year" by "a factor called a 'capitalization rate'", which is a "ratio representing the relationship between the land's annual net income and its value").

Finally, for the replacement-cost method, the appraiser first determines the underlying property's value, as if there were no improvements on it.  He then estimates the amount it would cost to construct the property's improvements as new.  Next, he determines the present worth of the improvements, as currently depreciated.  Finally, to reach a replacement-cost valuation, he subtracts that present worth from the as-new cost of the improvements.  The resulting figure is the replacement-cost value.  USPAP Standards Rule 1-4(b); *see also N. Natural Gas v. United States*, 470 F.2d 1107, 1110-11 (8th Cir. 1973) (explaining replacement-cost method and approving its use).

The tax court explained why it rejected Roddewig's use of the replacement-cost and income methods.  It ruled the replacement-cost method is of little use when reproduction of the property is unlikely.  *Whitehouse Hotel*, 131 T.C. at 147 (citing *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 403 (1949)).  The court stated it was unconvinced by Whitehouse that "the owners of the building would want to, or would be required to, reconstruct that 100-year-old structure if it were destroyed".  *Id.*  Further, the court explained that, even if the building would be replaced if destroyed, reliance on the replacement-cost method would still be inappropriate because it "is a poor indicator of value when estimating the value of older, special purpose buildings, since any estimate of obsolescence . . . is subjective".  *Id.* (citing *Crocker v. Comm'r*, T.C. Memo 1998-204, 1998 WL 294052 (8 June 1998)).

No. 09-60085

In rejecting the income method, the court noted: while that method is favored when comparable sales are unavailable, it is an unsatisfactory valuation method where the property has no track record of earnings that provides past income data to evaluate. *Id.* at 153 (citing *Duncan Indus., Inc. v. Comm'r*, 73 T.C. 266, 280 n.13 (1979); *Pittsburgh Terminal Corp. v. Comm'r*, 60 T.C. 80, 89 (1973)). Without such information, the appraiser must rely on data from similar properties, which reduces the appraisal's reliability. *Id.* (citing *Ambassador Apartments, Inc. v. Comm'r*, 50 T.C. 236, 243 (1968)).

Here, there was no track record of earnings because, at the time of the donation, the hotel had yet to be constructed. Any post-construction earnings data had no bearing on Roddewig's income-method valuation, which limited itself to information available at the valuation date, 29 December 1997. Therefore, it relied on income as projected on that date.

Based on these findings, the tax court found the comparable-sales method to be "the most reliable indicator of value". *Id.* at 147-56. Because, as discussed *infra*, we must remand for re-valuation, we do not reach whether the tax court erred in rejecting the income and replacement-cost methods. On remand, the tax court should reconsider all three methods, including which may be applicable, in determining the easement's value.

3.

According to Whitehouse, the tax court miscomprehended the highest and best use of the Maison Blanche and Kress buildings, both owned by Whitehouse on the date of donation of the easement. Whitehouse contends: such use is as a Ritz-Carlton, instead of as a non-luxury, hotel; and, the easement prohibited construction on top of the Kress building, thereby eliminating the possibility of constructing 60 additional hotel rooms.

"As a general rule, [as noted,] valuation of property for federal tax purposes is a question of fact that we review for clear error." *Adams*, 218 F.3d

at 385-86 (citing *Estate of Bonner v. United States*, 84 F.3d 196 (5th Cir. 1996)). As discussed *supra*, to the extent, however, the finding is "predicated on a legal conclusion *regarding the rights inherent in the property*, its valuation is subject to *de novo* review". *Id.* at 386 (citing *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 595 & n.4 (5th Cir. 1985)) (emphasis added).

A property's highest and best use is the "reasonable and probable use that supports the highest present value". *Frazee v. Comm'r*, 98 T.C. 554, 563 (1992) (quoting *Symington v. Comm'r*, 87 T.C. 892, 897 (1986)). "To determine what uses are reasonable and probable, we focus on '[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Id.* (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)) (alteration in *Frazee*); *see also* 26 C.F.R. § 1.170A-14(h)(3)(ii) (noting: where, as here, the tax court employs before-and-after valuation, "the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed").

Needless to say, finding a property's highest and best use is a critical aspect for determining its fair market value. *Olson*, 292 U.S. at 255 (holding highest and best use is to be considered "to the full extent that the prospect of demand for such use affects the market value"); *Frazee*, 98 T.C. at 563 ("Property should be valued to reflect the highest and best use of the property on the date of the valuation." (citing *Symington*, 87 T.C. at 896; *Stanley Works*, 87 T.C. at 400)). The key inquiry is what a hypothetical willing buyer would consider in deciding how much to pay for the property. *320.0 Acres*, 605 F.2d at 781. In other words, "[i]f a hypothetical buyer would not reasonably have taken into account that potential use in agreeing to purchase the property, such potential

No. 09-60085

use should not be considered in valuing the property". *Stanley Works*, 87 T.C. at 402 (citing *320.0 Acres*, 605 F.2d at 781).

a.

As stated, Whitehouse contends the highest and best use of the Maison Blanche and Kress buildings was as a Ritz-Carlton (per Roddewig's opinion), *not* as a non-luxury hotel (per Argote's opinion). The tax court did not explicitly rule on this issue, but it did not accept Roddewig's opinion on highest and best use. Accordingly, on this issue, the tax court's decision can be construed in two ways: even if the highest and best use was as a Ritz-Carlton, that had no effect on the property's value; or, a non-luxury hotel was the highest and best use. *See Whitehouse Hotel*, 131 T.C. at 159-60.

The tax court is required to "aid the appellate court by affording it a clear understanding of the ground or basis of [its] decision". *Curtis v. Comm'r*, 623 F.2d 1047, 1050 (5th Cir. 1980) (quoting *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 432 (5th Cir. 1977)); *see also Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 485 (5th Cir. 2002) (remanding for "more detailed findings . . . including a fuller explication of the court's ruling"); *Barrientes v. Johnson*, 221 F.3d 741, 763 (5th Cir. 2000) (noting: "where a district court fails to make necessary findings, a remand for entry of such findings is the usual recourse for an appellate court" (alteration omitted)); *Bell v. City of Dallas, Tex.*, 81 F. App'x 490, 491 (5th Cir. 2003) (unpublished) ("If we are unable to determine the basis for a district court's ruling, we cannot review it and must remand for a more specific determination." (citing *Curtis*, 623 F.3d at 1053)). Because the tax court's opinion can be read in either of the two above-described ways, we are left with findings that are "inadequate to permit us to fairly review [the tax court's] ultimate conclusions". *Curtis*, 623 F.2d at 1053. Moreover, because we must remand for re-valuation, this highest-and-best-use issue necessarily comes back into play and must be reconsidered.

Along this line, to be reconsidered on remand is the tax court's rejecting the idea that luxury-hotel developers operate in a national marketplace—this is the theory upon which Roddewig relied to justify his price-point adjustments. *See Whitehouse Hotel*, 131 T.C. at 160. Roddewig explained: because luxury-hotel developers "have their own criteria for rates of return, and they don't price [a property] based on what their competition in the local market is willing to pay and go a dollar more", luxury-hotel developers are willing to pay more than the local market demands. In the light of this theory, Roddewig relied, in part, on comparable sales from properties located in other cities, including hotels in New York City, Washington, D.C., Boston, and Cleveland.

The tax court disagreed that luxury-hotel developers would pay more than local market price: "Without evidence of th[is] phenomenon more convincing than Mr. Roddewig's testimony, we will not take the risk of inaccuracy that those adjustments carry". *Id.* The tax court's reasoning for rejecting this national-marketplace basis would seem to extend to its decision not to consider the nonlocal comparables utilized by Roddewig, any use of which also represents diminished reliance on the local market in favor of data from the national market. Again, this point is to be reconsidered on remand.

As discussed, it is also possible to interpret the tax court's rejection of Roddewig's adjustments in a second way: as an implicit agreement with Argote's opinion that the Maison Blanche and Kress buildings' highest and best use was as a non-luxury, not a Ritz-Carlton, hotel. In that case, the relevant question would be whether there was a "reasonable possibility" that the property would be developed into a non-luxury hotel. *See Olson*, 292 U.S. at 256-57.

Along that line, plans for financing redevelopment into a Ritz-Carlton were already in place before the easement was granted on 29 December 1997. For example, Whitehouse's contract to build the Ritz-Carlton hotel was signed on 19 February 1997. In addition, Whitehouse procured architectural plans for

conversion into the Ritz-Carlton in the summer of that year. The agreement with Ritz-Carlton and the architectural plans contemplated converting both the Maison Blanche and Kress buildings into the hotel.

On the other hand, Argote testified that he had seen hotel projects in similar degrees of development never come to fruition. As stated, he opined that a higher and better use for the property would be as a non-luxury hotel.

Although Argote's opinion seems implausible—the extent to which redevelopment was underway renders highly unlikely his conjecture that the project might never come to fruition—we are not faced with the task of reviewing the tax court's ruling on this point (if indeed it made one). Rather, on remand, the tax court will have the opportunity to "make the subsidiary findings necessary to render its ultimate conclusions comprehensible, or, if necessary, to modify its conclusions to conform to the evidence". *Curtis*, 623 F.2d at 1054.

b.

Whitehouse next contends the tax court erred in failing to consider the effect of the historic-preservation facade easement on the contiguous Kress building. The tax court considered only whether the easement *burdened* the Kress building; concluding it did not, the court found there was no difference between the potential use of the building before and after the conveyance of the easement. *See Whitehouse Hotel*, 131 T.C. at 131-35; *see also id.* at 161 ("We shall disregard the Kress Building in our calculations because Mr. Roddewig erred in believing that it was burdened by the servitude.").

As noted, for valuation, factual findings are reviewed for clear error; legal conclusions, *de novo*. *In re Stembridge*, 394 F.3d at 385. The easement's effect on property rights in the Kress building is, of course, a legal question, reviewed *de novo* and with applicable state law—in this instance, Louisiana—being applied. *Succession of McCord*, 461 F.3d at 623 ("Where a question of fact, such as valuation, requires legal conclusions, this Court reviews those underlying

legal conclusions *de novo*. . . . The determination of the nature of the property rights transferred is a question of state law that this Court reviews *de novo*." (citing *Adams*, 218 F.3d at 386)).

Several threshold matters are clear: Whitehouse owned both the Maison Blanche and Kress buildings on the day the easement was conveyed; because of the easement, Whitehouse could not build on top of the Kress building; the easement prohibits any future owner of the Maison Blanche building from obscuring its wall adjacent to the Kress building and, therefore, any successor who, like Whitehouse, owned both the Maison Blanche and Kress buildings could not build on top of the Kress building; any successor who *separately* owned the Kress building would *not* be bound by the easement; and, the condominium regime, established the day *after* conveyance of the easement, combined the Maison Blanche and Kress buildings into a single, indivisible unit of property.

In other words, the easement conveys a perpetual real right that *burdens* the Maison Blanche building. *See* LA. REV. STAT. ANN. § 9:1252 (allowing "owner of immovable property [to] create a perpetual real right burdening the whole or any part thereof of that immovable property, including . . . the facade" for "charitable[] or historic purposes"). The tax court was correct in ruling that the easement does *not* burden the Kress building in the same manner because the easement does not mention the Kress building. *See Whitehouse Hotel*, 131 T.C. at 131-35. The tax court's analysis ended there.

The easement's not burdening the Kress building does *not*, however, render that building irrelevant for easement-valuation purposes, because the relevant determination is the *effect* of the easement on the fair market value of the entire contiguous property owned by Whitehouse:

> The amount of the deduction in the case of a charitable
> contribution of a perpetual conservation restriction
> *covering a portion of the contiguous property owned by*
> *a donor* . . . is the difference between the fair market

25

No. 09-60085

value of the *entire contiguous parcel of property* before
and after the granting of the restriction.

26 C.F.R. § 1.170A-14(h)(3)(i) (emphasis added); *see also Browning*, 109 T.C. at 316 ("[For] a charitable contribution of a perpetual conservation restriction *covering a portion of the contiguous property owned by a donor*, . . . the amount of the deduction . . . is the difference between the fair market value of the *entire contiguous parcel* of property before and after the granting of the restriction." (emphasis added)). Accordingly, determining the easement's *effect* on the fair market value of the Kress building—contiguous property owned by Whitehouse at the time of the donation—is crucial for determining the fair market value of the easement. This is true regardless of the easement's not *burdening* the Kress building in the same way it burdens the Maison Blanche building, via the earlier-cited Louisiana law, § 9:1252.

To determine the easement's effect on the fair market value of the *contiguous* Kress building, owned by Whitehouse, the relevant inquiry is whether, when the easement was conveyed, it was reasonable and probable that a hypothetical buyer would determine the amount he would pay for the Maison Blanche and Kress buildings, including in the light both of the pending condominium agreement's combining the two properties into one legal unit and of the pending development's combining the two properties into one functional unit. *See Frazee*, 98 T.C. at 563 (stating highest and best use is the "reasonable and probable use that supports the highest present value" (quoting *Symington*, 87 T.C. at 897)); *320.0 Acres*, 605 F.2d at 781 (noting fair market value depends on the potential uses that a hypothetical purchaser will consider when evaluating how much to pay for the property).

This is important because, if the hypothetical buyer would *not* have contemplated the legal and functional combination of the two buildings—based

26

on, for example, the fact that the buildings were not legally or functionally combined on the date of donation—then the easement would have a different effect on the Kress building's fair market value. But, if the hypothetical buyer would have considered the buildings' pending legal and functional combination and the easement's resulting effect on the opportunity to build on top of the Kress building, then that should have been taken into account in determining fair market value.

As noted, the tax court limited its inquiry to whether the easement legally bound the Kress building; it merely considered a snapshot of the property's legal status as at the date of the conveyance. Noting that the easement does not mention the Kress building, the tax court ruled: Whitehouse had "failed to show how [its easement contractual] promise binds anyone who does not undertake it; *e.g.*, a person acquiring ownership of the Kress Building by *eminent domain* or as a result of the owner of the *building's bankruptcy*". *Whitehouse Hotel*, 131 T.C. at 135 (emphasis added).

But, the analysis should *not* have ended here: the tax court should have considered the easement's effect on fair market value in the light of the imminent legal and functional consolidation of the two buildings. In other words, the tax court was correct that, because, on the day of donation, the condominium regime was not yet in effect, a successor could have purchased the Kress building separately that day and would not have been bound by the easement; but, *as a matter of valuation*, the tax court erred by not considering the effect on market value of the buildings' pending combination.

To that end, a hypothetical buyer would have contemplated the pending combination of the buildings in deciding on a purchase price. Along that line, both buildings were then owned by Whitehouse. Regarding the *legal* combination of the buildings (*i.e.*, the condominium regime), it is implausible that a hypothetical buyer of the Kress building on 29 December 1997 would have

no knowledge of the plan to combine the buildings into a single piece of property via a condominium regime imposed the next day. (When questioned at oral argument here, counsel for Whitehouse explained the condominium regime was recorded after the facade donation to comply with "other provisions in the applicable treasury regulations" that required "the facade donation actually be recorded in order to prime the construction mortgage".)

The tax court found that the post-conveyance timing of the condominium declaration rendered it either minimally relevant or irrelevant to the valuation. *Whitehouse Hotel*, 131 T.C. at 134 n.9 (noting its decision not to consider the condominium declaration was "in part" because it was recorded the day after the easement conveyance, but *not* providing any other reasons). The tax court erred in failing to consider the effect on fair market value of the pending condominium regime's precluding any future legal separation between ownership of the two buildings.

Likewise, regarding the functional combination of the two buildings, a prospective buyer would have been aware that the renovation plans, which were already in place, involved the Kress building's containing, among other things, the *porte cochere* and air-conditioning supply units necessary to operate a hotel in the Maison Blanche building. For example, the *porte cochere* was required for operation of a Ritz-Carlton (luxury) hotel.

That hypothetical buyer would have realized that the effect of this functional combination of the buildings into a single unit was to preclude sale of one building separately from the other. It would be clear to him that, as a practical matter, the buildings only remain functional while under common ownership.

Thus, because, from the perspective of the hypothetical buyer, any future owner of the Kress building would also own the Maison Blanche building, that future owner would be precluded from constructing rooms that obscured the

No. 09-60085

Maison Blanche building's facade. This loss of opportunity would reduce the amount a willing buyer would pay for the parcel, and thereby reduce its fair market value.

Therefore, regardless of the easement's not *burdening* the Kress building, it *affected* the fair market value of the Maison Blanche and Kress buildings. Accordingly, the tax court erred in not determining that effect. Regarding that effect, Commissioner presents the following two erroneous contentions.

First, Commissioner asserts Roddewig failed to value all contiguous property because he did not consider either the Kress garage, which is contiguous to the Kress building, or the garage located across Iberville Street, also owned by Whitehouse. On the other hand, at oral argument here, Commissioner appeared to concede that the tax court erred when it failed to consider the easement's effect on all contiguous property. When questioned about that apparent concession, counsel for Commissioner stated: Whitehouse did not provide sufficient proof regarding the parking garages; and, therefore, the tax court was not presented with sufficient evidence to consider the easement's effect on all contiguous property.

Roddewig testified, however, that neither garage was contiguous *to the burdened Maison Blanche building*. Further, he testified that, even if the Kress garage were considered contiguous because it is contiguous to the Kress building, which is contiguous to the Maison Blanche building, the easement would not affect that garage's before-and-after value because it was already built to its highest potential. (Because Argote did not include the garage in his valuation, he presumably agreed that it did not affect the easement's value.) In the light of this testimony, even if the Kress garage was contiguous, the tax court's not considering it does *not* present the same legal concerns as its not considering the Kress building.

29

No. 09-60085

Second, regardless of the Maison Blanche and Kress buildings' being combined, Commissioner contends the wall of the Maison Blanche building that rises above the Kress building is not one the easement burdens. Commissioner points to the omission of this wall from photographs, attached to the easement, that were included to determine the easement's coverage "[i]n the event of uncertainty". *Whitehouse Hotel*, 131 T.C. at 179 (easement document as appendix to opinion). There is *not*, however, any uncertainty on this point in the easement's language. The wall is unambiguously included in the easement's definition of the covered "exterior surfaces" of the Maison Blanche building: "the exterior walls of the Lower Stories which are visible from Canal and Dauphine Streets . . . [and] the the exterior walls of the Upper Stories which are visible from Canal, Burgundy, Iberville, and Dauphine Streets". Because this language leaves no "doubt" regarding which walls are protected, there is no reason to look to the photographs or invoke the statutory-construction principle of resolving doubt in favor of the servient estate. *See* La. Civ. Code Ann. art 730 ("Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.").

In sum, the tax court erred in declining to consider the Maison Blanche and Kress buildings' highest and best use in the light of both the reasonable and probable condominium regime and the reasonable and probable combination of those buildings into a single functional unit, both of which foreclosed the realistic possibility, for valuation purposes, that the Kress and Maison Blanche buildings could come under separate ownership. This combination affected the buildings' fair market value.

The effect of the easement's impact on the property's fair market value, such as prohibiting building 60 additional rooms on top of the Kress building, is a question of fact for the tax court to decide on remand. Therefore, we vacate its valuation and remand for reconsideration of the easement's value. As discussed

*supra*, in making this valuation on remand, the tax court should, among other things, reconsider the experts' reports and valuation methods (including, *inter alia*, using non-local comparables) and their conclusions regarding highest and best use as a luxury or non-luxury hotel.

## B.

Finally, Whitehouse claims the tax court erred in upholding the gross undervaluation penalty. Obviously, our vacating the tax court's decision includes the penalty ruling's being vacated. And, subject to the tax court's valuation decision on remand, it may be that the penalty issue will be moot. In the alternative, the penalty may be at issue in the light of that decision.

Accordingly, consistent with the constitutional prohibition against advisory opinions, it is questionable whether we should reach this issue. Without deciding any issues related to a possible penalty, but in the interest of preserving judicial resources, we provide the following discussion to guide the tax court should the penalty be at issue on remand. *See, e.g., Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001) (vacating class certification because district court erred in shifting burden of proof for seeking class certification to party not seeking certification, but providing guidance on adequacy of class representative for district court on remand).

In challenging the penalty, Whitehouse contends the tax court should have found it satisfied both requirements of the reasonable-cause exception under 26 U.S.C. § 6664(c)(2). Pursuant to that exception, a gross undervaluation penalty shall *not* be assessed if: "(A) the claimed value of the property was based on a *qualified appraisal* made by a qualified appraiser, and (B) in addition to obtaining such appraisal, the taxpayer made a *good faith investigation* of the value of the contributed property". 26 U.S.C. § 6664(c)(2) (emphasis added).

In ruling on the merits of a reasonable-cause-exception claim, which, as stated, we are *not* doing here, reviewed for clear error is the tax court's

determination of whether the elements that constitute "reasonable cause" were proven;  reviewed *de novo* is its determination of "what elements must be present to constitute 'reasonable cause'". *Roberts v. Comm'r*, 860 F.2d 1235, 1241 (5th Cir. 1988) (citing *United States v. Boyle*, 469 U.S. 241, 250 n.8 (1985)). The tax court held that, although § 6664(c)(2)'s first provision  (qualified appraisal) had been met (as conceded by Commissioner), the second (good faith investigation) had *not.* 131 T.C. at 174.

The testimony by Drawbridge, the representative for Whitehouse, was the tax court's primary reason for rejecting Whitehouse's proof of its good faith investigation. *Id.* Drawbridge testified that, in determining the easement's value, Whitehouse relied, *inter alia*, on two appraisals:  the one by Cohen, and the one by Revac, Inc.  The Cohen appraisal was described *supra.*  The Revac post-donation appraisal, dated 14 January 1998, was obtained in connection with a mortgage on the property.

The Revac appraisal appraised the proposed Ritz-Carlton hotel, which included some or all of the Maison Blanche building, the Kress building, and the Kress parking garage.  It found the following fair market values for the property: "as is" on 4 December 1997, $35 million; upon prospective completion of construction, $125 million; and upon reaching stabilized occupancy, $135 million.

The Revac appraisal was admitted into evidence solely to determine the applicability *vel non* of an underreporting penalty.  Drawbridge also testified that Whitehouse relied on the professional tax advice it received from its auditors and legal counsel.

The tax court found this insufficient.  First (and most importantly), the tax court refused to credit Drawbridge's testimony because he did not become asset manager of Whitehouse until 2000, two years after Whitehouse submitted its 1997 Form 1065 ("U.S. Return of Partnership Income").  131 T.C. at 174.

No. 09-60085

(Drawbridge became the hotel's asset manager through his position as executive vice president of asset management for Quorum Hotels and Resorts (QHR). QHR served as general partner and tax-matters partner of Whitehouse through QHR Holdings-New Orleans, Ltd., a named party to this action.) Second, the tax court found that the Revac appraisal did not speak to the value of the easement. *Id.* at 174-75.  Having discredited the evidence Whitehouse submitted on this issue, the court ruled that Whitehouse failed to meet its burden of proof for entitlement to the reasonable-cause exception. *See Higbee v. Comm'r*, 116 T.C. 438, 446 (2001) (noting petitioner has burden to prove reasonable cause).

Whitehouse contends the tax court erred by discrediting Drawbridge's testimony.   Although Whitehouse concedes Drawbridge lacked personal knowledge about the advice and counsel Whitehouse received in preparing its 1997 Form 1065, it contends that, because Drawbridge testified as a representative of an entity (which, of course, cannot speak for itself), Drawbridge was competent to testify on matters within the limited partnership's knowledge. Such knowledge includes whether Whitehouse relied on legal and accounting advice in submitting its tax form.

Under *Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006), where a witness "acts as the agent for the corporation, he should be able to present [the corporation's] subjective beliefs . . . as long as those beliefs are based on the collective knowledge of [the corporation's] personnel".   In *Brazos*, defendant corporation designated its employee to be deposed as its representative under Federal Rule of Civil Procedure 30(b)(6). *Id.* at 432.  The employee was then called to testify at trial, and defendant objected pursuant to Federal Rule of Evidence 602, which requires a witness to have a basis of personal knowledge for his testimony. *Id.* The trial court sustained defendant's objections and agreed that the witness lacked personal knowledge. *Id.* Our

33

court reversed, holding the testimony should not have been so limited. *Id.* at 432.

Here, of course, the tax court did not exclude Drawbridge's testimony *per se*, but instead treated the issue as one of credibility. Regardless, if the penalty is at issue on remand, this determination must be reconsidered. Under our court's precedent, Drawbridge may have been competent and credible as Whitehouse's representative to testify to facts within the limited partnership's knowledge. Such facts include whether Whitehouse relied on professional advice in filing its 1997 Form 1065. Drawbridge testified that it did.

Further, when Drawbridge testified, he had the 1997 Form 1065 before him. That form, which was admitted into evidence, states that it was prepared by Whitehouse's financial auditors. It may be that this is direct evidence Whitehouse relied on professional advice in the preparation of the tax form, and such preparation required evaluation of the reasonableness of the stated value of the easement. *Cf. United States v. Baisden*, 2007 WL 1087162, at *17 (E.D. Cal. 10 April 2007) (issuing preliminary injunction enjoining a certified public accountant from preparing taxes where he had "engaged in conduct subject to penalty under I.R.C. § 6701 by preparing federal tax returns for customers for submission to the IRS containing items he knew would result in understatements of customers' tax liability").

Should this penalty be at issue on remand, a question will be whether Whitehouse met its burden of proof for reasonable cause.

> To demonstrate reasonable cause, a taxpayer "must show that he exercised 'ordinary business care and prudence.'" Treas. Reg. § 301.6651–1(c)(1). "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." *Boyle*, 469 U.S. at 251 . . . .

34

No. 09-60085

*New York Guangdong Finance, Inc. v. Comm'r*, 588 F.3d 889, 896 (5th Cir. 2009). Given that Whitehouse offered proof that it relied on its accountants' and attorneys' opinions of Cohen's appraisal, a possible issue on remand is whether Whitehouse needed to prove more to show reasonable cause. That is yet another question for the tax court to address, if necessary, on remand.

## III.

For the foregoing reasons, the tax court's decision is VACATED and this matter is REMANDED for further proceedings consistent with this opinion.

No. 07-40651

GARZA, Circuit Judge, concurring in part.

I concur in Part I, Part II.A.1, Part II.A.3.b, and Part III of the court's opinion. The remaining parts of the court's opinion, which describe and characterize issues that we ultimately do not decide, are unnecessary to resolve this case and have no bearing on the judgment. Federal courts are only permitted to rule upon an actual "case or controversy," and lack jurisdiction to render merely advisory opinions beyond the rulings necessary to resolve a dispute. *See SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 407 (1972); *Hayburn's Case*, 2 U.S. 408 (1792), as interpreted in *Muskrat v. United States*, 219 U.S. 346, 351–353 (1911); *see also* 28 U.S.C. § 46(b), (c) (2010) (stating that panels shall hear "cases and controversies"). Whether or not the Tax Court finds the extended discussion helpful does not change the fact that it is dicta and amounts to an impermissible advisory opinion.